John L. CARR, Anthony M. Frank, and S. Davidson Herron, Jr., Plaintiffs,

v.

FIRST NATIONWIDE BANK, a Federal Savings Bank, First Nationwide Financial Corporation, a Delaware Corporation, and the First Nationwide Financial Corporation Deferred Compensation Plan, Defendants.

No. C-92-2927 MHP.

United States District Court, N.D. California.

March 2, 1993.

---

**1480**

### MEMORANDUM AND ORDER

PATEL, District Judge.

This action for declaratory and injunctive relief, or alternatively, for contract damages, was brought by plaintiffs, former executive employees of defendants First Nationwide Bank and First Nationwide Financial Corporation (collectively, "the Bank" or "the Savings and Loan"). They seek to enforce contractual rights under the terms of the First Nationwide Financial Corporation Deferred Compensation Plan ("the Plan" or "the Top Hat Plan") pursuant to Section 502(a) the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a). The matter is now before the court on the parties' cross-motions for summary judgment. For the reasons explained below, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED.

### BACKGROUND

Beginning in 1979, the Savings and Loan adopted a deferred executive compensation arrangement, the Plan at issue in this action. Joint Statement of Material Facts Not In Dispute ("Jt. Stmt."),[1] ¶¶ 12–13. The Plan was first adopted in 1979, was amended and "restated" in 1983, amended in 1986, amended in 1990 and amended again in 1992. *Id.* ¶¶ 13, 27, 35, 38 & 44.

Approximately twenty-five individuals, including plaintiffs, over the course of the past thirteen years have deferred their compensation pursuant to the Plan. *Id.* ¶ 10. Plaintiff John L. Carr ("Carr") was employed by the Savings and Loan from 1973 until 1989 and

was its Vice Chairman and General Counsel when he terminated his employment at the Savings and Loan. *Id.* ¶ 2. Plaintiff Anthony M. Frank ("Frank") was employed by the Savings and Loan from 1971 to 1988 and was its Chairman and Chief Executive Officer when he terminated his employment with the Savings and Loan. *Id.* ¶ 3. Plaintiff S. Davidson Herron, Jr. ("Herron") was employed by the Savings and Loan from 1976 to 1983 and was its Chief Financial Officer when he terminated his employment with the Savings and Loan. *Id.* ¶ 4.

### I. The Plan Documents

#### A. *The 1979 Plan*

The Plan was originally adopted by the Bank in October 1979 ("the 1979 Plan") by amending the then existing 1977 Performance Share Plan ("the 1977 Plan") to become a deferred compensation plan. *Id.* ¶¶ 13–15. The 1979 Plan, or 1977 Plan as Amended, provided participants the new option of deferring the payment of performance share awards to which participants might become entitled under the Plan by submitting written deferral notices to the Bank. *Id.* ¶ 21; Plaintiff's Appendix of Exhibits in Support of Motion for Summary Judgment ("App."), Ex. 2 ¶ 11(H). The 1979 Plan also provided the following formula for the rate of interest to be paid on deferred amounts:

> ... there shall be credited to [a participant's deferred compensation account] quarterly for the benefit of the participant interest for the average balance in the account during the quarter at a rate equal to the highest rate of interest paid by the Company or its savings and loan subsidiary on savings certificates or borrowings during the calendar quarter in which interest on the participant's account is earned.

*Id.* In addition, Plan participants could select when they wanted payments of their deferred awards to begin, as well as the schedule such payments would follow:

---

1. The parties have agreed for purposes of summary judgment that the facts stipulated to in the Joint Statement are undisputed. However, they disagree in certain instances that certain facts are material. Unless the court states otherwise, if a fact stipulated to in the Joint Statement is relied on by the court in this Memorandum and Order, the court has found that fact to be a material fact.

In the deferral notice the participant may elect not to receive any payments from his account until the date of the participant's retirement or termination of employment, or such other date as is specified in the deferral notice (the "Commencement Date"), at which time payments to the participant would be made under one of the following [three] methods selected by the participant in the deferral notice ...

*Id.* The 1979 Plan then set forth three distinct alternative payout options from among which a participant could select in the deferral notice and under each of which payments "shall" be made to the participant on and/or after his selected "Commencement Date". *Id.*

Finally, the 1979 Plan contained the following "Termination and Modification" provision:

The Board of Directors may at any time terminate the Plan (without canceling or altering any outstanding awards thereunder), if in its judgment, the tax accounting or other effects of the Plan or potential payouts under prospective awards would not be in the best interests of the Company. Without canceling, reducing or altering any outstanding awards thereunder, the Board of Directors, at any time, or from time to time, may modify or amend the Plan in whole or in part ... [followed by language requiring stockholder approval for amendments increasing numbers of Performance Share Units authorized or shares of Common Stock paid out under the Plan].

*Id.* ¶ 10.

### B. *The 1983 Plan*

The Plan was amended and "restated" by the Bank in 1983 ("the 1983 Plan"). Jt. Stmt. ¶¶ 27–29. The stated "Purpose" of the 1983 Plan was "to provide for an unfunded deferred compensation arrangement for a select group of management or highly compensated employees" of the Bank. *Id.* ¶ 32; App. Ex. 3 ¶ 1.

With respect to deferrals, interest and payouts, the 1983 Plan remained consistent with the 1979 Plan. The interest rate formula remained:

a rate equal to the highest rate of interest paid by the Company or its savings and loan subsidiary on savings certificates or borrowings during the calendar quarter in which interest on the Participant's Account is earned.

Jt. Stmt. ¶ 30; App. Ex. 3 ¶ 7. The 1983 Plan continued to provide a choice of three alternative payout methods by which a participant could elect to receive payments "upon retirement or termination of employment, or such other date as is specified" by selecting the preferred method in the deferral notice. *Id.*

The 1983 Plan also provided, regarding "Payout on Termination of Employment," that:

Should a Participant die, become disabled, retire under the Company Retirement Plan or be terminated by the Company without cause, the Participant's Deferred Amounts shall not be forfeited and he shall receive such Amounts in accordance with the provisions of the Plan.

Jt. Stmt. ¶ 31; App. Ex. 3 ¶ 9.

Finally, the 1983 Plan amended the former provision regarding "Amendment or Modification" and provided that:

The Plan may be modified or amended in whole or in part at any time or from time to time by the Board of Directors.

Jt. Stmt. ¶ 34; App. Ex. 3 ¶ 1.

### C. *The 1986 Plan*

On December 19, 1986, the Plan was again amended. Jt. Stmt. ¶¶ 35–36. The 1986 amendment to the Plan ("the 1986 Plan") changed only Section 7 of the 1983 Plan and all other sections remained the same, including the 1983 Plan's provisions regarding Purpose, Administration, Payout on Termination of Employment, and Amendment or Modification. Jt. Stmt. ¶ 37. The amendment to Section 7 partially changed the interest rate formula that would be applied to Deferred Compensation Accounts.

The 1986 amendment to Section 7 retained the 1979 and 1983 Plans' interest rate formula for "Prior Amounts", defined as amounts credited before December 19, 1986 or credited after that date pursuant to deferral no-

tices received before January 19, 1986. However, as to amounts otherwise credited on or after December 1, 1986, or "Subsequent Amounts", the amended Section 7 adopted a wholly new interest rate formula.[2]

### D. *The 1990 Plan*

The Plan was again amended effective July 1, 1990 ("the 1990 Plan"). Jt. Stmt. ¶ 38. The 1990 amendment included some significant changes from prior plans in its provisions regarding "Amendment, Modification or Discontinuance" as follows:

> The Plan may be modified or amended in whole or in part, or be discontinued at any time or from time to time by the Board of Directors of First Nationwide · Financial Corporation, but no such action shall retroactively impair or otherwise adversely affect the rights of any person to payments under the Plan which has [sic.] accrued prior to the date of such action, as determined by the Committee.

*Id.* ¶ 41; App.Ex. 6 ¶ 12. Regarding its "Effective Date" the 1990 Plan added:

> The Plan restates and amends effective as of July 1, 1990, the provisions of the Deferred Compensation Plan adopted by the Board of Directors of First Nationwide Financial Corporation on October 24, 1979, as amended by such Board on February 15, 1983, and December 19, 1986, and as restated by such Board on December 18, 1987 ("Prior Plan"). Any election made prior to July 1, 1990, under the Prior Plan shall be governed by the provisions of the Restated and Amended Plan, except to the extent that the provision of the Restated and Amended Plan shall impair or otherwise adversely affect a Participant's rights under the Prior Plan in which case (and

only to the extent) the provisions of the Prior Plan shall apply.

Jt. Stmt. ¶ 42; App. Ex. 6 ¶ 17.

However, the 1990 Plan did not change the interest rate or payout provisions of the prior plans. Jt. Stmt. ¶ 43. The interest rate provision of the 1990 Plan remained identical to that of the 1986 Plan. Jt. Stmt. ¶ 43; App. Ex. 6 ¶ 7(B). The 1990 Plan's provisions regarding repayment or payouts to Plan participants were also substantially identical to those of the 1986 Plan. Jt. Stmt. ¶ 43; App. Ex. 6 ¶ 7(D).

### E. *The 1992 Plan*

The most recent amendment to the Plan was adopted by the Savings and Loan effective August 1, 1992 ("the 1992 Plan"). Jt. Stmt. ¶ 44; App. Ex. 8. The 1992 Plan represents an extensive revision and modification of the provisions contained in the 1990 and prior Plans. The 1992 Plan retains the language of the 1990, 1986 and 1983 Plans regarding "Purpose of the Plan" and "Administration of the Plan." Jt. Stmt. ¶ 45. However, it substantially modifies the provisions regarding "Amendment, Modification or Termination" and "Amendment Effective Date" of the 1990 Plan. *Id.* ¶¶ 46–47. The 1992 Plan also eliminates the interest rate formulae contained in prior versions of the Plan and replaces them with a new formula. *Id.* ¶ 48. Similarly, the 1992 Plan alters the payout schedules specified by plaintiffs in their deferral, notices under the terms of the prior plans and replaces them with new payout provisions. *Id.* ¶ 50.

With regard to "Amendment, Modification or Termination," the 1992 Plan changes the previous general language and provides much more specific terms as follows:

---

**2.** The amended Section 7 provided:

There shall be credited to [each Deferred Compensation Account], commencing on the date on which Amount would have been paid, absent an election to defer, (A) with respect to Amounts credited to the Account prior to December 19, 1986 or creditable subsequent to December 19, 1986 pursuant to a Deferral Notice received by the Company prior to January 1, 1986 ("Prior Amounts"), interest on the average balance of such Prior Amounts in the Account during such calendar quarter at a rate equal to the highest rate of interest paid by the

Company or its savings and loan subsidiary on savings certificates or borrowings during such calendar quarter, and (B) with respect to Amounts otherwise credited to the Account on or after December 19, 1986 ("Subsequent Amounts"), interest on the average balance of Subsequent Amounts in the Account during such calendar quarter at a rate equal to the Three-month Treasury Bill Rate (as hereinafter defined) plus one and one half percentage points. [Definition of "Three-month Treasury Bill Rate" omitted]

Jt.Stmt. ¶ 36; App.Ex. 4 ¶ 7.

The Board of Directors of First Nation-wide Financial Corporation reserves the power at any time and from time to time to modify or amend the Plan in whole or in part, or terminate (in whole or in part) any or all of the provisions of the Plan (including, by way of example, but not by way of limitation, any rate of interest whether applicable to active, terminated or retired participants). Any such amendment, modification, discontinuance or termination shall be effective at such date as the Board of Directors shall determine.

Id. ¶ 46; App. Ex. 8 ¶ 12.

With regard to "Amendment Effective Date," the 1992 Plan also changes the previous provision. Deleting the language of the 1990 Plan that the 1990 amendments would not be effective over prior plans to the extent that they "shall impair or otherwise adversely affect a Participant's rights under the Prior Plan," App. Ex. 6 ¶ 17, the 1992 Plan provides instead that its amendments are effective without limitation:

This Plan Amendment is effective as of August 1, 1992. The provisions of the Deferred Compensation Plan adopted by the Board of Directors of First Nationwide Financial Corporation [including the various amendments and restatements] shall be governed by the provisions of this August 1, 1990 Amendment.

Jt. Stmt. ¶ 47; App. Ex. 8 ¶ 17.

Under the 1992 Plan, effective August 1, 1992, the interest payable to all Deferred Compensation Accounts changes to "an amount equal to the rolling three-year average of the market three-year fixed-rate Federal Home Loan Bank of San Francisco ("FHLB") advance rate...." Jt. Stmt. ¶ 48; App. Ex. 8, ¶ 7(B). This is a significant modification from the previous interest rate formulae applied under the Plan.

The 1992 Plan also replaces the payout schedules selected by participants under the prior plans with a schedule of five equal payments over five years to participants with deferral accounts of less than one million dollars (defined as "Small Accounts") and a schedule of ten equal payments over ten years to participants with deferral accounts of over one million dollars ("Large Ac-counts"). Jt. Stmt. ¶ 50; App. Ex. 8 ¶¶ 7(D)(1) & 7(D)(2).

## II. Plaintiffs' Deferral of Their Compensation

During their employment with the Bank plaintiffs earned income as employees of the Bank which the Bank was obliged to pay them unless plaintiffs elected to defer portions of such income under the Plan. Jt. Stmt. ¶ 52. Plaintiffs elected to defer substantial amounts of income by submitting a number of deferral notices during the periods they were employed by the Bank. Id. ¶¶ 52, 56–58; Declaration of John L. Carr ("Carr Dec.") ¶¶ 9–11; Declaration of Anthony M. Frank ("Frank Dec.") ¶ 10–12; Declaration of S. Davidson Herron, Jr. ("Herron Dec.") ¶¶ 6–8. Because the last of plaintiffs ceased working at the Bank in 1989, all of plaintiffs' deferrals were made, and their deferral notices were submitted to the Bank, prior to the adoption of the 1990 and 1992 Plans.

## III. Effect of the 1992 Plan on Plaintiffs' Deferred Compensation Accounts

The overall effect of the 1992 Plan amendments on plaintiffs' deferred compensation accounts is to change the interest rate applied to the accounts from the effective date of the 1992 Plan forward, resulting in a net reduction in *future* interest payments. However, the 1992 amendments do not reduce the interest already paid or the remaining principal amounts of deferred compensation as of the effective date of the 1992 amendments. The 1992 Plan does alter the payout schedules under which deferred compensation and interest thereon is repaid to plaintiffs.

Until this action was commenced, plaintiffs had been paid amounts, and on payout schedules, in accordance with the interest rate formulae and deferral election notices under the versions of the Plan in effect at the times that plaintiffs provided the Bank with their respective deferral notices. Jt. Stmt. ¶ 53. When the 1992 Plan was adopted, plaintiffs' deferred income was earning interest at the interest rates provided for in the prior plans. Id. ¶ 48. For amounts defined as "Prior Amounts" under the 1986 and 1990 Plans,

that rate was 13.5% (as of the last quarter of 1992). *Id.* For amounts defined as "Subsequent Amounts" under the 1986 and 1990 Plans, that rate was 5.25% (as of December 31, 1991). *Id.* ¶ 49. Under the terms of the 1992 Plan, the interest rate applicable to all of plaintiffs' deferrals would be 8.47% (through the end of 1992). *Id.* ¶ 48; App. Ex. 8, ¶ 7(B).

If the repayment schedules set forth by plaintiffs in their various respective deferral election notices are followed, the amounts credited to plaintiffs Herron's and Frank's deferred compensation accounts will be paid to them in quarterly installments over a period in excess of more than ten years, and the amounts credited to plaintiff Carr's account will be paid to him in varying installments over a period of less than ten years. Under the terms of the 1992 Plan, the repayment schedules elected by each of the plaintiffs would not be followed. Rather, the Bank intends to pay Herron annual installments over a period of exactly five years; and to pay Carr and Frank annual installments over a period of exactly ten years. Jt. Stmt. ¶ 55.

### IV. The Action Before This Court

Plaintiffs filed this action on July 28, 1992, only a few days before the 1992 Plan took effect. Essentially, they ask this court to enforce their contractual rights under the prior versions of the Plan in effect when they made their deferred compensation elections. To that end, plaintiffs seek a declaration from this court that the Savings and Loan must repay their deferred compensation under the interest formulae in the pre–1992 plans and the payment schedules elected in plaintiffs' deferral notices. They also seek an injunction requiring defendants to pay them benefits in accordance with the requested declaration and enjoining defendants from applying unilaterally any changes to the Plan that would deprive plaintiffs of their contractual rights. Plaintiffs alternatively pray for contract damages.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by 'depositions, answers to interrogatories, or admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The moving party does not surmount its initial burden through conclusory allegations as to the state of the material on file, however, it is *not* required to "support *its* motion with affidavits or other similar material negating the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

The court's function on a motion for summary judgment is not to make credibility determinations. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

### DISCUSSION

This is a case of first impression under ERISA. The question presented is whether the participants in an executive deferred compensation, or "Top Hat", plan may invoke

a federal common law theory of unilateral contract to prevent the plan sponsor from amending the plan to the participants' detriment after the participants have become entitled to repayment under the terms of plan.

Plaintiffs seek relief under the enforcement provisions of ERISA, 29 U.S.C. § 1132, and move for summary judgment, on two grounds. First, they argue that the Bank waived any right to adopt the 1992 Plan amendments by adopting provisions in the 1990 Plan limiting the Bank's right to amend the Plan in a manner that impairs the rights of participants to deferred income under the terms of prior plans. Second, they argue that even absent the claimed waiver, under the federal common law of contract applicable to ERISA plans, the 1992 Plan amendments violate their rights under a series of unilateral contracts formed when they deferred their compensation under prior versions of the Plan. They urge that the Bank's reserved power to amend the Plan contained in the 1979, 1983 and 1986 versions of the Plan which state the terms of these unilateral contracts did not entitle the Bank to amend the Plan to change the interest and repayment terms as to income deferred prior to amendment.

Defendants move for summary judgment on several grounds. First, they urge rejection of plaintiffs' waiver and federal common law of contract arguments. They assert that all versions of the Plan, including the 1990 Plan, gave the Savings and Loan the right to amend or modify the Plan in the manner attempted by the 1992 Plan. Moreover, they vigorously argue that "Top Hat" plans may be amended, modified or terminated at any time as a matter of ERISA law and policy even absent an express power to amend and that, accordingly, plaintiffs' unilateral contract theory should be rejected. Secondly, defendants argue that plaintiffs' action is barred by the doctrine of unclean hands because plaintiffs "participated in" or "created"

the various versions of the Plan under which they deferred their compensation.[3]

For the reasons stated below, the court finds that plaintiffs have met their summary judgment burden of showing that the 1992 Plan violates their contractual rights under federal common law principles applicable under ERISA. Because the court rules on this ground, the court does not address the parties' arguments regarding waiver. As required by Federal Rule of Civil Procedure 56, plaintiffs have established that there remains no genuine issue of material fact with regard to their claim and that they are entitled to judgment as a matter of law.

As explained below, although it is a close call, the court finds plaintiffs' arguments the more persuasive. Moreover, while the court finds that the high interest rates and favorable payout schedules guaranteed to plaintiffs under the pre–1990 plans may suggest some self-dealing, defendants have failed to submit any evidence to support their defense that plaintiffs' action is barred by the doctrine of unclean hands.

I. Plaintiffs' Federal Common Law Contract Claim

While the parties apparently do not dispute that the participants in a "Top Hat" plan may sue to enforce the terms of the plan under ERISA, they vigorously disagree regarding whether participants may sue under a common law theory of unilateral contract. As an initial matter, the court holds that the federal common law developed under ERISA generally governs the enforcement of Top Hat plans. The court also holds that the unilateral contract principles that have been applied by the federal courts to "qualified" or "funded" pension plans may also govern Top Hat plans, which are "unfunded" and not "qualified",[4] where the terms of the claimed unilateral contracts are clear from formal written plan documents.

---

**3.** Defendants also argued in their initial brief that the Savings and Loan is "not estopped" from amending the plan, apparently in anticipation that an estoppel theory would be advanced by plaintiffs. As no such argument has been made by plaintiffs, defendants' arguments regarding estoppel are irrelevant to the instant

cross-motions and need not, accordingly, be further addressed by the court.

**4.** The terms "funded" and "qualified" as used here refer to plans that are subject to the full substantive provisions of ERISA.

■ In the particular case at bar, the court reaches these conclusions with no small degree of reluctance. A principal reason for the enactment of ERISA was "to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire." H.R. No. 93–807, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4670, 4676. Given the inferior financial condition in which plaintiffs' stewardship apparently left the Bank, there is reason to question the usefulness and social productivity of plaintiffs' service to that employer.[5] Moreover, the terms of the Plan which plaintiffs seek to enforce in this action guarantee them retirement incomes which are far beyond "adequate". Indeed, the rates of return on plaintiffs' deferrals appear to border on the unconscionable.[6]

However, governing ERISA law and policy and the terms of the Plan as written leave the court no choice but to rule in plaintiffs' favor.

### A. ERISA, Top Hat Plans and Federal Common Law of Contract Generally

ERISA provides its maximum protection to employee pension benefit plans, which are subject to elaborate accrual, vesting and funding requirements. 29 U.S.C. §§ 1051–1085. Welfare benefit plans, while subject to certain disclosure and fiduciary duty requirements, *see* 29 U.S.C. §§ 1021–1031, 1101–1114, are not subject to ERISA's more stringent requirements. Executive deferred compensation plans such as the Bank's Plan fall into neither category, but are nevertheless governed by ERISA.

The Bank's Plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" within the meaning of 29 U.S.C. § 1101(a)(1).[7] Jt. Stmt. ¶ 8. Such plans are commonly referred to as "Top Hat" plans. *See, e.g., Miller v. Eichleay Engineers, Inc.,* 886 F.2d 30, 34 n. 8 (3d Cir.1989); *Wolcott v. Nationwide Mut. Ins. Co.,* 884 F.2d 245, 250 n. 2 (6th Cir.1989); U.S. Dep't of Labor ERISA Advisory Ops. 90–14A (May 8, 1990) & 89–24A (September 25, 1989).

■ Top Hat plans are "employee benefit plans" within the meaning of ERISA. *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989) (applying the ERISA preemption statute, 29 U.S.C. § 1144(a)). However, they are not subject to the substantive requirements of ERISA regarding participation and vesting, funding and fiduciary duty. 29 U.S.C. §§ 1051(2), 1081(a)(3) & 1101(a)(1); *see also Miller,* 886 F.2d at 34 n. 8; *Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923, 930–31 (3d Cir.1985).

■ Nevertheless, Top Hat plans remain subject to the enforcement provisions of ERISA codified at 29 U.S.C. § 1132(a). *See Barrowclough,* 752 F.2d at 935–37 (recognizing a federal cause of action to enforce the terms of a Top Hat plan under 29 U.S.C. § 1132(a)); *see also* ERISA Advisory Ops. 90–14A & 89–24A, *supra* (same). Under 29 U.S.C. § 1132(a), a participant in an ERISA plan may bring a civil action as follows:

. . .

to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan [and] to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to

---

5. *See* the Discussion, at Part II, below.

6. Plaintiff Frank, at the time he terminated his employment with the Bank, had deferred a total of $3,845,081 into the Plan. Jt.Stmt. ¶ 56. As of June 30, 1992, the total amount credited to Frank's account, including interest and payouts, was $14,181,764. *Id.* This represents a return of nearly 370% on Frank's original investment.

Plaintiff Carr originally deferred a total of $1,912,068 in compensation. Jt. Stmt. ¶ 57. As of June 30, 1992, Carr's total amount credited, including interest and payouts, was $4,047,624. *Id.* This represents a return of nearly 212% on Carr's investment.

Plaintiff Herron deferred $801,996 into the Plan. Jt.Stmt. ¶ 58. As of June 30, 1992, Herron's total amount credited, including interest and payouts, was $3,317,699. *Id.* This equals a return of nearly 414% on Herron's deferral.

7. The identical language is contained in 29 U.S.C. §§ 1051(2) and 1081(a)(3).

enforce any provision of this subchapter or the terms of the plan.

Although the Ninth Circuit has not spoken on the issue, in *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d at 935–37, the Third Circuit recognized a cause of action for breach of the terms of Top Hat plans under 29 U.S.C. § 1132(a) and held that principles of federal common law govern the enforcement of such plans. *Barrowclough* involved a deferred compensation plan very similar to the one before this court. Like the Savings and Loan's Plan, the plan in *Barrowclough* allowed certain executives to reduce their tax liability by deferring income which would be credited to them in an account, would accumulate interest, and would eventually be repaid to them by the plan sponsor at retirement, termination or otherwise. 752 F.2d at 926.

*Barrowclough* is consistent with the Ninth Circuit's analysis in cases involving other types of benefit plans. For example, in *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1499–1500 (9th Cir.1984), construing 29 U.S.C. § 1132(a) with regard to the question of federal jurisdiction over a pre-ERISA employee retirement plan, the court held that Congress intended "federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by the federal policies at issue." 738 F.2d at 1500. It added that "[a]ctions to recover benefits or enforce rights under the terms of a plan will typically involve the application of those general principles of contract law with which the state courts have had substantial experience before ERISA." *Id.* at 1500 n. 2.

Similarly, in *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1502 (9th Cir.1985), a case involving severance benefits, the court held that:

ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Instead, Congress intended for the courts, borrowing from state law where appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits.

The court in *Scott* went on to find preempted under 29 U.S.C. § 1144(a) (the ERISA preemption statute) a number of state law claims asserted by the plaintiffs, including one for breach of contract, but then held that plaintiffs were free to assert the same claims under ERISA. 754 F.2d at 1505–06.

In light of these authorities, it is clear that plaintiffs may enforce the terms of the Bank's Top Hat Plan under 29 U.S.C. § 1132 and that federal common law of contract principles govern. However, none of these authorities speaks to the issue of whether unilateral contract rules should apply in the Top Hat context. This is a question that is most appropriately decided "in light of the policies expressed in ERISA and other federal labor laws." *Scott,* 754 F.2d at 1502.

## B. *Top Hat Plans as Unilateral Contracts*

Plaintiffs argue that the Top Hat Plan in this case should be viewed as an offer to enter into unilateral contracts which plaintiffs accepted by complying with the terms of the Plan in effect when they performed by electing to defer their income, working for the Bank and terminating employment with the Bank for reasons other than "cause". Thus, plaintiffs' rights under the pre–1990 versions of the Plan are "accrued" in a contractual sense, although not "vested" under ERISA's substantive provisions.

Defendants assert that the Top Hat Plan should not be treated as a unilateral contract because the courts have held that "welfare benefit plans" within the meaning of 29 U.S.C. § 1002(1) may be freely amended, modified or terminated even absent a reserved power to do so in the plan. Since Congress gave Top Hat plans even less protection than welfare benefit plans (welfare benefit plans are generally subject to the fiduciary duty provisions of 29 U.S.C. § 1101–1114, while Top Hat plans are not), defendants urge that this court should not apply a unilateral contract theory to prevent amendment of the Plan in this action.

As noted above, this is a close question and existing case law offers minimal guidance. However, for the following reasons, the court finds that the policies embodied in ERISA do not prohibit Top Hat plan participants from

enforcing their plans as a unilateral contracts which may not be amended without their consent, so long as the claimed contractual rights arise from the terms of the written Top Hat plan documents.

### 1. Analogy to Pension Benefit Plans

It is well settled that pension benefit plans are unilateral contracts which employees accept by appropriate performance. *See, e.g., Pratt v. Petroleum Prod. Mngmt. Employee Sav. Plan*, 920 F.2d 651, 661 (10th Cir.1990); *Hurd v. Illinois Bell Tel. Co.*, 234 F.2d 942, 946 (7th Cir.), *cert. denied*, 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956); *see also Morales v. Plaxall, Inc.*, 541 F.Supp. 1387, 1391 (E.D.N.Y.1982); *Denzer v. Purofied Down Products Corp. Profit–Sharing & Retirement Plan*, 474 F.Supp. 773, 776 (S.D.N.Y.1979). These courts have held that because a pension plan is a unilateral contract, it may not be amended or modified retroactively by the sponsor—after a participant has accepted the plan offer by retiring or other performance specified in the plan—in a manner that alters or impairs the rights of participants under the terms of the plan. *Pratt*, 920 F.2d at 661; *Morales*, 541 F.Supp. at 1391; *Denzer*, 474 F.Supp. at 776.

Top Hat plans which provide for deferred compensation to be repaid after retirement or termination of employment, such as the Bank's, resemble "employee pension benefit plan[s]" as defined by 29 U.S.C. § 1002(2), insofar as they may:

> result[ ] in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A)(ii); *see also Barrowclough*, 752 F.2d at 930 (treating Top Hat deferred compensation plan as an "employee pension benefit plan"). However, Top Hat plans are also unlike pension benefit plans in the sense that their purpose need not be to provide pension benefits and they need not necessarily result "in a deferral of income . . . for periods extending to the termination of covered employment or beyond," as would pension benefit plans. For example, an undisputed purpose of the Top Hat Plan before the court is to provide tax benefits. Moreover, under the terms of the Plan in effect when plaintiffs deferred, in addition to deferring repayment until after retirement or termination of employment, they could elect to be repaid on "such other date as is specified in the deferral notice." App.Ex. 2 ¶ 11(H) (1979 Plan); App.Ex. 3 ¶ 7 (1983 Plan); App. Ex. 4 ¶ 7 (1986 Plan).

■ However, despite these differences, it is clear that Top Hat plans are also not "welfare benefit plans" within the meaning of 29 U.S.C. § 1002(1), which covers "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits" and a variety of other types of benefits. Nor do defendants argue that Top Hat plans are welfare benefit plans under 29 U.S.C. § 1002(1).

■ Defendants nevertheless assert that cases treating employee benefit plans as unilateral contracts, such as *Pratt, Morales* and *Denzer*, are inapposite because they all involve "funded" or "qualified" pension plans, whereas the Plan before the court is an "unfunded" plan. While it is true that all of these cases also involved consideration of ERISA substantive provisions that are not applicable to Top Hat plans, their holdings that pension plans are unilateral contracts, in each case, did not rely on ERISA's provisions. *See Pratt*, 920 F.2d at 658–61; *see also id.* at 658 ("The district court determined that the plan was liable on two independent grounds: reduction of an accrued benefit under ERISA *and* breach of contract. We agree with the district court.") (emphasis added); *Morales*, 541 F.Supp. at 1390–91; *Denzer*, 474 F.Supp. at 776. Thus, these cases support the proposition that to the extent a Top Hat plan resembles a "pension plan," its terms constitute an offer for a unilateral contract and a participant's performance under the plan's terms create a binding contract. However, as explained below, this court does not hold that Top Hat plan participants may raise unilateral contract claims when such claims are not based on specific provisions of written Top Hat plan documents.

## 2. *The Welfare Benefits Cases*

The court does not agree with defendants that the line of cases regarding the free amendability of "welfare benefit" plans under ERISA should always preclude application of unilateral contract rules in the enforcement of Top Hat plans under ERISA. The welfare benefit cases do not compel such a result for several reasons.

First, defendants' argument that because Top Hat plans are subject to "less" substantive ERISA protection than welfare benefit plans, unilateral contract principles should not apply, is specious. Defendants correctly argue that welfare benefit plans are generally subject to the fiduciary duty provisions of ERISA while Top Hat plans are not. *See* 29 U.S.C. § 1101(a)(1). However, as defendants concede,[8] the rule that welfare benefit plans are freely amendable means that the *amendment or termination* of such plans is not governed by the fiduciary duty provisions of ERISA. *See, e.g., Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 817, *reh'g denied*, 962 F.2d 655 (7th Cir.1992) (discussing cases); *Musto v. American General Corp.*, 861 F.2d 897, 912 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989) ("The case law ... makes it clear that when an employer decides to establish, amend, or terminate a benefits plan ... its actions are not to be judged by fiduciary standards."); *Young v. Standard Oil* (Indiana), 849 F.2d 1039, 1045 (7th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988) ("[An] employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan."); *West v. Greyhound Corp.*, 813 F.2d 951, 956 (9th Cir.1987) (Changes in unfunded welfare benefits "are not to be reviewed by fiduciary standards."). Thus, when it comes to amendment or termination, there is no meaningful difference between ERISA's substantive coverage of welfare plans and its substantive coverage of Top Hat plans. Both welfare and Top Hat plans may be amended or terminated without regard to ERISA's fiduciary duty provisions.

Second, the rule that amendment of welfare benefit plans is not subject to the vesting provisions of ERISA does not give employers *carte blanche* to amend welfare benefit plans where the plans themselves may be interpreted to provide that benefits are contractually vested or accrued, even if the plan includes an explicit reserved power to amend. While ERISA does not require vesting of welfare plans, "a [welfare] plan itself may imply a vested benefit." *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 95–96 (3d Cir.1992); *see also Senn*, 951 F.2d at 818 ("[s]ince ERISA does not provide for the vesting of welfare benefits, vestment ... must arise from [the applicable agreements and plan documents]."); *Internat'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 301–02 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992) ("[A] court may look to the parties' intent to determine when vesting should occur."); *In 're White Farm Equipment Co.*, 788 F.2d 1186, 1193, *reh'g denied*, 7 Employee Ben. Cas. (BNA) 1736 (6th Cir. 1986) ("the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated."). Therefore, even though ERISA does not substantively prohibit amendment of welfare benefit plans, such amendment nevertheless may be prohibited by contract, as reflected in plan documents. That is precisely what plaintiffs argue here with respect to the Top Hat Plan.

The courts that have refused to allow ERISA plaintiffs to use unilateral contract rules to prevent amendment of welfare benefit plans have done so because the particular ERISA plan documents in question did not provide a basis for contractual vesting or accrual of the claimed benefits and allowing vesting under such circumstances would undermine the policy of ERISA not to require vesting of such benefits. *See, e.g., Alday v. Container Corp. of America*, 906 F.2d 660, 665–66 (11th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Musto v. American General Corp.*, 861 F.2d

---

**8.** *See* Defendants' Memorandum of Points and Authorities in Support of Summary Judgment at 19–24.

at 907; *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988).

For example, the formal ERISA plan documents before the Eleventh Circuit in *Alday* contained an amendment clause similar to that found in the 1983 Top Hat Plan in the instant action. 906 F.2d at 662 (formal plan gave sponsor the right "to terminate, suspend, withdraw or modify the Plan in whole or in part, at any time"). Finding "[n]o basis . . . in the language of the plan documents to contradict [defendant's] reservation of the right to amend or even terminate the plan at any time," *id.,* the court rejected plaintiffs' unilateral contract theory, holding that the claimed "right to lifetime medical benefits at a particular cost can only be found if it is established under the terms of the ERISA-governed benefit plan document." *Id.* (refusing to consider certain communications not considered "plan documents" under ERISA, 29 U.S.C. §§ 1022, 1102).

Similarly, the Sixth Circuit in *Musto* rejected plaintiffs' unilateral contract theory, which asserted that plaintiffs became the beneficiaries of an unamendable unilateral contract for medical benefits upon retirement. 861 F.2d at 907. The court held that "[a]s far as the plan itself is concerned, it is perfectly clear that no immutable insurance benefits can be said to vest upon retirement." *Id.* After carefully scrutinizing the language of the ERISA plan summaries given to employees, the court held that the district court had erred in finding that the employer's reserved power to amend contained in the summaries was ineffective. *Id.* at 906. Finding no textual basis for the district court's reading of the written plan summaries to promise "lifetime paid up medical insurance," the *Musto* court held that the district court had erred as a matter of law in concluding that the reserved power to amend made the (textually non-existent) "promise" of lifetime benefits illusory. *Id.*

The Second Circuit in *Moore* held that plaintiffs' unilateral contract claim for medical benefits, "if accepted, would undermine ERISA's framework which ensures that plans be governed by written documents filed under ERISA's reporting requirements and that [summary plan descriptions], drafted in understandable language, be the primary means of informing participants and benefi-

ciaries." 856 F.2d at 492 (citing 29 U.S.C. §§ 1022, 1102). Finding that the various summary plan descriptions issued by the employer unambiguously reserved the right to amend or terminate the plan, the court rejected plaintiffs' argument that their contract consisted of the " 'totality of the [formal and informal] representations made to the employees by the company, and the actions of the employees in accepting these representations by remaining with the company.' " *Id.* at 491–92. Accepting such a claim would undermine Congress' decision to "reject[ ] the automatic vesting of welfare plans." *Id.* at 492.

None of these cases holds that welfare plan participants cannot obtain by contract—including unilateral contract—any vested or accrued rights that ERISA does not substantively provide. These decisions are not especially concerned with whether the welfare benefit plans they interpret are denominated bilateral or unilateral contracts. Rather, they require that any contractually accrued rights be discernible from the written terms of the formal ERISA plan documents themselves. However denominated, the plan documents before the courts in *Alday, Musto* and *Moore* simply did not support the claims asserted by the plan participants.

In contrast, as explained more fully below, the relevant Top Hat plan documents in this case explicitly and in great detail promise the interest rate and payout schedules which plaintiffs now seek to enforce. Regardless of whether the Plan is a bilateral or a unilateral contract, the language of the Plan documents makes it clear that these promises "shall" be performed as to amounts deferred by Plan participants who first perform by submitting required deferral notices. As explained below, the Bank's reserved power to amend cannot operate to make these promises illusory.

Plaintiffs' unilateral contract argument is thus not a means of bypassing ERISA and obtaining vested rights which neither the statute not the Plan provide. The ERISA policies offended by the unilateral contract claims in the welfare benefits cases above are not offended by an action such as this one, where the asserted unilater-

al contract is based on explicit promises in the ERISA plan documents themselves.[9]

The Second Circuit's holding in *Reichelt v. Emhart Corp.*, 921 F.2d 425 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991), finding unilateral contract rules in the welfare benefits context absolutely preempted by ERISA, does not compel a different result. *Reichelt* involved an alleged *de facto* severance benefits plan asserted to exist by the plaintiffs on the basis of the defendants' past practice. 921 F.2d at 429. There was no formal written plan document. *Id.* The court held that a unilateral contract theory, whether under state or federal common law, was not available to plaintiffs to enforce the terms of the alleged plan because such a theory would allow plaintiffs to claim vesting in a type of plan which Congress chose to exclude from the vesting provisions of ERISA. *Id.* at 432. The unilateral contract claim was accordingly held preempted by ERISA as inconsistent with the underlying policies of the Act. *Id.*

The facts of *Reichelt* may well explain the Second Circuit's eagerness to find unilateral contract principles preempted. There simply was no evidence in *Reichelt* to indicate that "the parties [had] themselves set out by agreement or by private design, as set out in plan documents, [that the claimed] benefits had vest[ed]." *In re White Farm Equipment Co.*, 788 F.2d at 1193. Had such evi-

dence been present in *Reichelt,* the result in that case may have been different.

 In any event, Top Hat plans are not welfare benefit plans. The welfare benefits cases, while analogous, are accordingly not paradigms which must be followed in this Top Hat plan action. Defendants have cited the court absolutely no legislative history or other authority that supports their position that allowing plaintiffs to enforce the Plan as a series of unilateral contracts would offend the policies embodied in ERISA. Defendants do point out [10] that the Department of Labor maintains that Congress exempted Top Hat plans from the substantive requirements of ERISA because

> Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

U.S. Dep't of Labor ERISA Op. 90–14A. In interpreting ERISA and other statutes, a court may look not only to legislative history, but also to the views of the agency charged with administering it. *Winterrowd v. David Freedman and Co., Inc.*, 724 F.2d 823, 825 (9th Cir.1984). The agency's opinions "while

---

9. It is worth noting that the Supreme Court has suggested, albeit in *dicta*, that deferred compensation is a category of benefit which is ordinarily contractually vested or accrued. In *Litton Financial Printing v. N.L.R.B.*, —— U.S. ——, ——, 111 S.Ct. 2215, 2227, 115 L.Ed.2d 177 (1991) and *Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union, AFL–CIO*, 430 U.S. 243, 248 & n. 4, 97 S.Ct. 1067, 1070 & n. 4, 51 L.Ed.2d 300 (1977), the Court implicitly appears to recognize that deferred compensation is in the nature of a contractually "accrued" or "vested" right that remains intact even after the contract itself has expired.

 The issue in both of these collective bargaining cases was whether claimed rights were subject to arbitration pursuant to the provisions of collective bargaining agreements. Rights subject to arbitration were only those rights "which accrued or vested under the Agreement, or rights which carried over after expiration of the Agreement ... as continuing obligations under the contract." *Litton,* —— U.S. at ——, 111 S.Ct. at

2227. In this context, the *Nolde Bros.* Court discussed the plaintiff union's analogy of severance benefits to deferred compensation as a potential ground for finding that the severance benefits were vested or accrued. 430 U.S. at 243, 97 S.Ct. at 1067. In *Litton,* the court considered a similar argument that the layoff provisions of a collective bargaining agreement were analogous to deferred compensation, and therefore gave rise to rights which were contractually "vested" or "accrued", insofar as such provisions emphasized employee seniority. —— U.S. at ——, 111 S.Ct. at 2227. The Court rejected this latter analogy on the ground that seniority was only a secondary factor considered under the particular layoff provisions involved. *Id.*

 However, the Court's reasoning in both *Litton* and *Nolde Bros.* implicitly recognizes that rights to deferred compensation are ordinarily "vested" or "accrued" by contract.

10. Defendants' Memorandum of Points and Authorities in Support of Summary Judgment at 14.

**1492**

not binding, [are] entitled to substantial deference." *Id.* at 825–26 (quoting *Turner v. Prod,* 707 F.2d 1109, 1115 (9th Cir.1983)).

However, the Department of Labor's opinion does not bolster defendants' arguments, but rather, undermines them. To the extent that Congress relied on Top Hat participants' power to influence the contents of their plans in denying them the substantive protections of ERISA, it would be absurd to deny such individuals the ability to enforce the terms of their plans in contract. If defendants' position were correct, it would be difficult to imagine what Top Hat participants would have the power to obtain "through negotiation or otherwise"—apparently, not much more than illusory promises.

■■■ Therefore, the court holds that notwithstanding ERISA's exemption of Top Hat plans from most of its substantive requirements, the participants in such plans may enforce the terms of their plans under the federal common law rules of unilateral contract generally applicable to pension plans, so long as the asserted unilateral contract rights are found in the terms of plan documents themselves.

### C. The Parties' Rights under the Bank's Top Hat Plan

■■■ The court finds that, under the versions of the Plan in effect during the periods of plaintiffs' employment, the Bank made offers to plaintiffs to enter into unilateral contracts regarding deferred compensation. Plaintiffs accepted these offers by performing under the terms of the Plan versions in effect when they deferred their compensation. Accordingly, plaintiffs accrued certain rights under those particular versions of the Plan, namely the 1979, 1983 and 1986 Plans. Notwithstanding the Bank's reserved power to amend, the court further finds that under the terms of the 1979, 1983 and 1986 Plans, the Bank is not entitled to amend or modify the Plan in a manner that infringes plaintiffs' rights with regard to interest and repayment.

### 1. The Relevant Contracts

■■■ Depending on its terms, a formal written Top Hat plan, like a pension plan, may constitute an offer to enter into a unilateral contract which may be accepted by performance. *See Pratt,* 920 F.2d at 661; *Morales,* 541 F.Supp. at 1391; *Denzer,* 474 F.Supp. at 776. In this case, to accept, plaintiffs had to (1) execute a deferral notice, electing to defer their income and specifying the amount and the repayment schedule; (2) render continuous service to the Bank; and (3) not be terminated from employment "for cause." *See, e.g.,* App.Ex. 3 ¶¶ 7, 9 (terms of the 1983 Plan). The Plan was accordingly an offer for a unilateral contract in which the consideration for the agreement is performance of an act or forbearance to act. *See Restatement (Second) of Contracts ("Rest. (2d)")* §§ 30, 71 (1981).

■■■ Each time plaintiffs submitted deferral notices as provided in the version of the Plan then in existence, *see* App. Exs. 14–16 (plaintiffs' deferral notices), plaintiffs accepted the offer embodied in the terms of the Plan by beginning performance. *See Rest. (2d)* §§ 45(1), 50(2). Unilateral contracts were then formed, based on the contents of the Plan and the deferral notices on the dates the notices were submitted.[11] By the time each plaintiff had terminated his employment with the Bank for reasons other than "cause" he had completed the required performance under the terms of the Plan.

■■■ The Plans defining plaintiffs' rights would accordingly be those in effect when they gave the required deferral notices, not the 1990 or 1992 Plans, which were adopted after plaintiffs had deferred their compensation and had, in fact, left the Bank. The provisions of the 1990 and 1992 Plans are thus irrelevant to determining plaintiffs' rights. The court now considers whether the general reserved power of amendment contained in the pre–1990 versions of the Plan gave the Bank unfettered power to change the interest rate and payout schedules set forth in those versions of the Plan.

---

**11.** Even if the Plan were deemed an offer to form a bilateral or executory contract, to be accepted by means of a return promise, plaintiffs' submission of their deferral notices would constitute return promises and contracts would have been formed. *See Rest. (2d)* § 62(2) (acceptance by beginning performance operates as a promise to render complete performance).

### 2. *Effect of the Amendment Clauses*

The pre–1990 versions of the Plan contain two different amendment clauses. With respect to "Termination and Modification," the 1979 Plan provides:

> The Board of Directors may at any time terminate the Plan (without canceling or altering any outstanding awards thereunder), if in its judgment, the tax accounting or other effects of the Plan or potential payouts under prospective awards would not be in the best interests of the Company. Without canceling, reducing or altering any outstanding awards thereunder, the Board of Directors, at any time, or from time to time, may modify or amend the Plan in whole or in part ... [followed by language requiring stockholder approval for amendments increasing numbers of Performance Share Units authorized or shares of Common Stock paid out under the Plan].

*Id.* ¶ 10. The 1983 Plan amends the 1979 provision to the following:

> The Plan may be modified or amended in whole or in part at any time or from time to time by the Board of Directors.

Jt.Stmt. ¶ 34; App.Ex. 3 ¶ 12. The 1986 Plan retains the 1983 amendment clause. Jt. Stmt. ¶ 37; App.Ex. 4 ¶ 12. The 1979 clause includes the limitation "without canceling, reducing or altering any outstanding awards thereunder." That language and other parts of the clause were omitted by the 1983 amendment to produce the general clause which defendants now argue entitles the Bank to change the interest rate and payout schedule provisions set forth in other parts of the pre–1990 Plan.

The federal common law of ERISA contract interpretation mandates that the intended meaning of the parties should be determined, if possible, from the explicit language of the plan. *See Alexander,* 967 F.2d at 93. Where plan language is unambiguous, its natural meaning is presumed to be conclusive evidence of the parties' intent. *Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 29–30 (1st Cir. 1991). However, the plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole. *Alexander,* 967 F.2d at

93. Thus, the provisions of an ERISA plan should be construed so as to render none nugatory and to avoid illusory promises. *DeGeare v. Alpha Portland Industries, Inc.,* 837 F.2d 812, 816 (8th Cir.1988), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989) (welfare benefits plan under ERISA); *see also International Union, United Auto, Aero., and Agric. Workers of America v. Yard–Man, Inc.,* 716 F.2d 1476, 1479–80 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) (collective bargaining agreement under Labor Management Relations Act). Moreover, specific, mandatory clauses take precedence over general ones. *See Pratt,* 920 F.2d at 651–52 (general plan provision must yield to mandatory and specific provision). Finally, an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to one which leaves any part unreasonable or of no effect. *Musto,* 861 F.2d at 906; *Rest. (2d)* § 203.

Applying these basic principles to the Plan, the court finds that the amendment clauses cannot mean what the Bank asserts they mean. The 1983 amendment clause states that "[t]he Plan may be modified or amended in whole or in part at any time or from time to time." In the absence of any "basis in the language of the plan documents to contradict [the Bank's] reservation of the right to amend or terminate the plan at any time," *Alday,* 906 F.2d at 665, this clause would appear unambiguously to give the Bank the power to amend the Plan in the manner attempted by the challenged 1992 amendments. However, the Plan documents contain numerous provisions that cannot reasonably be construed otherwise than to contradict the broad power the Bank now asserts.

The 1979 Plan contains explicit provisions regarding how participants in the Plan "may" defer compensation and "shall" be paid such deferred compensation. *See* App.Ex. 2, ¶ 11(H). Participants "may, by written notice (the 'deferral notice') ... [to the Bank] elect to defer" compensation owed them by the Bank. *Id.; see also* App.Exs. 14, 15 & 16 (plaintiffs' deferral notices). After deferral by means of the required written deferral notice, there "*shall* be credited to [the partic-

ipants' accounts] ... [quarterly] interest ... at a rate equal to the highest rate of interest paid by the company or its savings and loan subsidiary on savings certificates or borrowings during the [quarter in which the interest is earned]." *Id.* (emphasis added). In the deferral notices, participants "may elect" to receive repayment beginning on "the participant's retirement or termination of employment, or such *other* date as is specified in the deferral notice ("the Commencement Date")." *Id.*

Repayment *"shall"* occur according to the schedule selected by each participant in each deferral notice from among three alternative but specific repayment schedule options provided by the Plan. *Id.* (emphasis added). The 1979 Plan further provides that: "[u]pon the death of the participant, the Company *shall* continue to make payments pursuant to the method elected by the participant [from among the alternative repayment schedule options] to such beneficiaries or beneficiaries as the participant specifies in his deferral notice." *Id.* (emphasis added).

Substantially the same provisions make up approximately half of the text of the 1983 Plan, specifying how participants or their beneficiaries "shall" be repaid after deferring their compensation by providing written deferral notices. *See id.* Ex. 3, ¶ 7. Although it changes the interest rate formula as to "subsequent amounts," the 1986 Plan also devotes about half of its text to how participants "shall" be repaid. *See id.* Ex. 4, ¶ 7.

The 1979 Plan contains a clause that states the Board may amend or modify the Plan, but that clause is clearly limited by language that prohibits "canceling, reducing or altering any outstanding awards" under the Plan. *Id.* Ex. 2 ¶ 10. The 1983 and 1986 Plans contain the shorter, more general and on its face unlimited amendment clause quoted above. However, both of these later Plans also contain a provision stating that, unless a participant is terminated for cause, "the Participant's Deferred Amounts shall not be forfeited and he shall receive such Amounts in accordance with the provisions of the Plan." *Id.* Exs. 3, 4 ¶ 9.

Plaintiffs correctly argue that if the amendment provision in the 1983 and 1986 Plans means what defendants contend, then the Bank reserved to itself unfettered discretion to decide that it would not honor any of the specific promises in the Plan regarding how payments "shall" be made. In effect, all of the promises about how interest "shall" be computed and how repayment "shall" occur would be illusory, because the Bank would be free to insert the word "not" before each "shall". This is a result which basic principles of ERISA federal contract law will not allow. A short general provision stating that the Bank "may" amend cannot operate to nullify numerous other specific provisions regarding how, when and at what rates of interest the Bank "shall" repay plaintiffs' deferred income.

Accordingly, the court finds that the reserved power of amendment found in the pre–1990 versions of the Plan means only that the Bank is free to amend, modify or terminate the Plan with respect to income deferred by deferral notices presented to the Bank *after* the effective date of a proposed amendment, modification or termination and not before. Such amendment does not impair any rights of Plan participants in the specific and mandatory interest and repayment terms of the Plan because no contracts are actually formed until participants have accepted the offer posed by the Plan by submitting deferral notices. However, when—as in plaintiffs' cases—deferral notices have been completed and provided to the Bank, the Bank becomes contractually obligated to repay Plan participants' deferred compensation in accordance with the interest and repayment terms of the Plan in effect at the time of the deferral notices. With respect to such deferrals, the Bank's reserved power to amend, modify or terminate the Plan does not entitle the Bank to avoid its express contractual obligations.

Any other interpretation of the Plan's amendment clause would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory. This court's construction of the Plan treats it as an integrated whole, giving a reasonable, lawful and effective meaning to all the terms of its terms. *Rest. (2d)* § 203; *cf. Musto,* 861 F.2d at 906 (district court's interpretation violated

this basic canon where district court read a promise into the plan that was not there).

## II. Defendants' Unclean Hands Defense

■ Defendants argue that plaintiffs' contract action under ERISA is barred by the equitable doctrine of unclean hands. The court recognizes that there may well be circumstances under which it may exercise its equitable powers to prevent enforcement of the terms of a Top Hat plan under ERISA. *See, e.g., Carson v. Local 1588*, 769 F.Supp. 141, 143–46 (S.D.N.Y.1991) (union official convicted of criminal activity which allegedly caused injury to union pension plan of which he was fiduciary might be estopped from receiving "Top Hat pension").

The Top Hat deferred compensation agreements which plaintiffs seek to enforce may well border on the unconscionable, given the less than optimal state in which plaintiffs apparently left the Bank. The following description of the Bank's troubles recently appeared in the *Wall Street Journal*:

> First Nationwide's woes are akin to those that caused hundreds of thrifts to fail. It suffers from the lingering effects of heavy bets on the riskiest real estate, far-flung expansion, high operating costs, and weak management. Part of this is the legacy of Anthony Frank, the former postmaster general, who served as the thrift's chairman for 17 years until early 1988. Mr. Frank's grand vision is summed up by the thrift's name.

Ralph T. King, *Ford Motor's Big Thrift Unit Hopes the Worst is Over: First Nationwide Bank, Bloated With Bad Loans, Tries to Slim Down*, Wall Street Journal, December 16, 1992. It is entirely possible that plaintiffs improperly got far the better end of the deferred compensation deal they negotiated with the Bank. The high interest rate guaranteed by the 1979 and 1983 Plans suggests a kind of self-dealing which was unfortunately all too-common in the savings and loan industry during the period plaintiffs managed the Bank. However, the court cannot deprive plaintiffs of their contractual rights under ERISA based on suspicions alone.

If the Bank has any legal grounds to set aside the agreements, it has not presented any evidence of such grounds to this court. The Bank's "unclean hands" argument consists of nothing more than the unsubstantiated allegation of counsel that "[a]s the stewards of the Savings and Loan, [plaintiffs] repeatedly acted in their own interest in the establishment and administration of the Plan." Defendant's Memorandum of Points and Authorities in Support of Summary Judgment, at 25. This court cannot grant summary judgment absent admissible evidence to back up the Bank's allegations. *See Celotex*, 477 U.S. at 331, 106 S.Ct. at 2556.

The fact that plaintiffs may have participated or voted in certain committee meetings which led to adoption of the Plan or Plan amendments proves nothing, when the evidence shows that plaintiffs either abstained from voting or the amendments in question were approved unanimously by the Board of Directors. *See* App.Exs. 1, 3 & 4 (Board of Directors' Minutes regarding approval of the 1979, 1983 and 1986 Plans). If the Bank has any real evidence of self-dealing in these transactions, it simply has not provided it to the court. Instead the Bank asks the court to allow it to violate its contracts with plaintiffs based on mere allegations of counsel. That the court may not do.

It is ironic that plaintiffs may invoke ERISA, an Act intended to protect the retirement income of ordinary working people, in order to enforce the terms of what appears to be an excessively generous Top Hat plan. However, as the foregoing discussion explains, the inescapable conclusion is that they may. The Bank has not made *any* showing of jeopardy to other employee benefit plans afforded greater protection by ERISA than the Top Hat Plan which would result from this court's enforcement of plaintiffs' Top Hat agreements. Had the Bank done so, this court may have had a basis to exercise its equitable authority under the policies of ERISA. The court may thereby have been able to deny enforcement of the Top Hat agreements. *See Local 1588*, 769 F.Supp. at 143–46. But the most the Bank has provided is a declaration stating that the Bank has had to reduce the employee benefits paid to its current employees due to "operating losses." Declaration of Charles S. Kissh ¶ 12 (teller making an average of $14,200 a year pays $169 a month for family health coverage).

Given the dearth of admissible evidence proffered by the Bank, the court can only conclude that the Bank made some very bad bargains in its Top Hat agreements with plaintiffs. It must now live with those bargains.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is hereby GRANTED. Defendants' motion for summary judgment is hereby DENIED.

Further, for the reasons set forth above, the court hereby FINDS AND DECLARES:

(1) that defendants must repay plaintiffs' deferred compensation according to the interest formulae set forth in the versions of the Top Hat Plan in effect when plaintiffs tendered their various deferral notices to the Bank;

(2) and, defendants must repay plaintiffs' deferred compensation in accordance with the repayment schedules selected in plaintiffs' various deferral notices, as provided in the 1979, 1983 and 1986 versions of the Plan.

Further, defendants are hereby ORDERED to repay plaintiffs all deferred compensation in accordance with plaintiffs' deferral notices and the terms of the Plan in effect when those notices were tendered.

Further, defendants are hereby PERMANENTLY ENJOINED from adopting or applying any amendments to the Plan that would deprive plaintiffs of their contractual rights, as set forth in this Order.

IT IS SO ORDERED.