John L. KEMMERER and James
H. Jordan, Plaintiffs,

v.

ICI AMERICAS, INC., Defendant.

Civ. A. No. 92–5986.

United States District Court,
E.D. Pennsylvania.

Jan. 4, 1994.

J. Dennis Faucher and Bryan L. Clobes, Miller, Faucher, Chertow, Cafferty and Wexler, Philadelphia, PA, for plaintiffs.

Michael L. Banks, Morgan, Lewis & Bockius, Mark S. Dichter, Catherine Reid, Philadelphia, PA, and Julia W. Manning, Zeneca, Inc., Wilmington, DE, for defendant.

## *MEMORANDUM*

BUCKWALTER, District Judge.

### INTRODUCTION

Plaintiffs John L. Kemmerer ("Kemmerer") and James H. Jordan ("Jordan") brought this claim against defendant ICI

Americas, Inc. ("ICI") to enforce the terms of their unfunded executive deferred compensation plans. Specifically, plaintiffs seek to enforce the repayment schedule they selected under the plans. They also seek damages caused by defendant's failure to follow the payout schedule they selected under the plans. Currently before this Court are cross motions for summary judgment filed by both parties. Defendant moved for summary judgment on the issue of liability and on the issue of damages. Plaintiffs moved for summary judgment on the issue of liability. For the following reasons this Court grants summary judgment for the plaintiffs.

### *STATEMENT OF FACTS*

The facts in this case are undisputed and thus, this case is ripe for summary judgment.[1] Plaintiffs in this case are former high level executives of ICI. During the 1970's ICI offered certain executives an opportunity to participate in two different deferred compensation plans.

The first arrangement was called the Deferred Compensation Agreement ("DCA Plan"). This plan was adopted in connection with the merger and acquisition of Atlas Chemical Industries, Inc. by ICI. The participants in the plan, who were former managers and executives of Atlas, agreed to surrender their Atlas stock options in exchange for ICI's promise to maintain an unfunded deferred compensation account equalling the value of the surrendered stock options.

The DCA was amended on February 1, 1985. Participants were given the option of electing a repayment method for their deferred compensation. The 1985 plan stated:

> Amounts deferred under this agreement shall be paid to Optionee commencing January 15 of the year following the year of his separation from service in five percentage installments ... unless, prior to separation from service the Optionee files a written notice with the Secretary of Company, ("Secretary") requesting a different form of distribution. Such notice shall be treated as an election by the Optionee to

---

1. The factual narrative was taken from the facts submitted by both parties. There was no substantial difference between the parties concerning the facts at issue in this opinion.

receive payment by the method requested. The method of distribution requested shall be irrevocable after the close of business on the date of Optionee's separation from service.

DCA 1985 ¶ 7(a), Plaintiffs' Statement of Undisputed Facts, Exhibit 3.

In December 1974, ICI offered certain employees another type of deferred compensation plan called the Executive Supplemental Retirement Plan ("ESRP"). The ESRP required participants to annually notify the company whether and in what amounts they wished to defer their compensation for the following year and it provided that each choice was irrevocable. ESRP 1974 ¶ 1, Plaintiffs' Statement of Undisputed Facts, Exhibit 5.

On December 31, 1984, the ESRP was amended and it included the same exact clause allowing participants to select a method of distribution for their deferred compensation as the DCA Plan of 1985. ESRP 1984 ¶ 4, Plaintiffs' Statement of Undisputed Facts, Exhibit 7.

Participants in the DCA and the ESRP plans, collectively referred to as the Deferred Executive Compensation Plan ("DEC Plan"), were permitted to defer income and accumulate investment returns on a tax deferred basis.[2] The DEC plan (ESRP and DCA) was unfunded and thus, investment returns were accomplished by allowing participants to "shadow" or "track" the investment portfolios that were available in a separate Deferred Compensation Plan (DCP).

The separate DCP Plan, developed by Atlas in 1958, was a funded plan that permitted participants to defer portions of their income and it required ICI to make actual contributions to the plan equal to the amounts deferred by the participants. The money was then invested by the company based on the various investment options selected by participants. The accounts of DEC participants were credited with amounts they would have received had their deferred compensation actually been invested pursuant to their shadow instructions. Since the unfunded DEC

investment returns merely shadowed the funded DCP investments and were only credited to the participants' accounts, the post-retirement distributions had to be paid from the general assets of ICI as opposed to an investment trust fund like the DCP.

Prior to their retirement, both plaintiffs, in accordance with the DEC Plan provisions, selected a method for distribution of their deferred compensation after retirement. Jordan elected to have his DEC benefits paid in specific annual amounts until the year 2007. Kemmerer elected to have his plan balance distributed in fixed annual amounts until such time as his account balance would be exhausted. Plaintiffs Jordan and Kemmerer retired in 1986 and 1989 respectively. While ICI did begin to pay plaintiffs in accordance with the distribution methods selected, in 1991 ICI decided to cease payment by the methods selected and instead, advised plaintiffs that the remainder of their account balances would be paid in three lump sum installments in January 1992, January 1993 and January 1994.

Defendant ICI has made the first two payments and plaintiffs brought this suit claiming they have lost benefits under the DEC Plan due to the increased tax liability resulting from distribution of the compensation in lump sums. Thus, plaintiffs ask this Court to enforce the repayment method for plaintiffs deferred compensation under the DEC Plan and to grant plaintiffs damages for defendant's breach of the terms of the plan.

## DISCUSSION

### I. Enforcement of Unfunded Pension Plans Under ERISA and the Applicability of Federal Common Law

■ The DEC plan at issue in this case is an executive deferred compensation plan that is generally referred to as a Top Hat plan. *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30, 34 n. 8 (3d Cir.1989). Top Hat plans are "employee benefit plans" within the meaning of ERISA. *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989). These plans are unfunded and maintained by an employer pri-

---

2. Plaintiff Jordan was a participant of the DCA and the ESRP plans. Plaintiff Kemmerer participated in the ESRP, but he did not begin until 1985.

marily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *Id.*

ERISA provides its maximum statutory protection to funded pension benefit plans by making them subject to elaborate accrual, vesting and funding requirements. Subchapter I of ERISA deals with "Protection of Employee Benefit Rights" and this is the subchapter that governs the plan in this case. 29 U.S.C. §§ 1001–1145. This subchapter is divided into Subtitles A and B. Subtitle B (Regulatory Provisions) is divided into five parts dealing with reporting and disclosure (Part 1 §§ 1021–31), participation and vesting (Part 2 §§ 1051–61), funding (Part 3 §§ 1081–86), fiduciary responsibility (Part 4 §§ 1101–14) and administration and enforcement (Part 5 §§ 1131–1145).

■ Executive deferred compensation plans are subject to none of the substantive requirements under ERISA in Parts 1–4 of Subtitle B, of Subchapter I. *Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923, 30–31 (3d Cir.1985); *Miller,* 886 F.2d at 34 n. 8. Nonetheless, these types of plans are subject to the enforcement provisions of ERISA in 29 U.S.C. § 1132(a).

In *Barrowclough,* which involved an unfunded executive deferred compensation plan similar to the one in this case, the court found that the plan participants could sue under ERISA to enforce the terms of their plan. 752 F.2d at 926–27. The plan gave certain executives an option to defer as much as 25% of their income to reduce their tax liability. The amount deferred was credited to an account and was to be paid after retirement, death, disability or termination of the executive. William Barrowclough sued the company under ERISA, 29 U.S.C. § 1132(a), for breaching the terms of his plan when the employer refused to pay plaintiff any of his deferred income. One of the central questions addressed by the court was whether plaintiff had a cause of action to enforce the terms of the unfunded deferred compensation plan even though the plan was exempt from the substantive provisions of ERISA.

After a detailed examination of the statutory language, structure and legislative history of ERISA, the court found that Mr. Barrowclough had a federal cause of action under ERISA's enforcement provisions, Part 5 of Subtitle B, of Subchapter I [3], to enforce the terms of his unfunded deferred compensation plan despite the fact that the plan was not subject to the substantive provisions of Parts 1–4 of Subtitle B, of Subchapter I. *Barrowclough,* 752 F.2d at 929–30. Parts 2–4 of Subtitle B have explicit language exempting plans that are "unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3) & 1101(a)(1). Regulations promulgated by the Secretary of Labor also make it clear that unfunded plans are not subject to the requirements of Part 1. Thus, Congress included explicit exemptions in the provisions it intended not to apply to unfunded plans.

The *Barrowclough* court concluded from the legislative history that Congress did not intend to exclude unfunded plans from ERISA entirely. 752 F.2d at 930. There is no exemption in Part 5, 29 U.S.C. 1132(a), for unfunded deferred compensation plans. Consequently, although a participant in an unfunded pension plan cannot bring claims for violations of the substantive provisions of ERISA, a participant can sue to enforce the terms of its unfunded plan.

Since the substantive law of ERISA is not applicable in cases involving unfunded deferred compensation plans, courts must look to another source of law as a basis for enforcing such plans. The *Barrowclough* court found that Congress intended that federal common law developed under ERISA would be the applicable law for actions enforcing these types of plans. 752 F.2d at 936–37. Thus, the court ruled that participants of unfunded deferred compensation plans have a federal cause of action under ERISA to enforce the terms of their plans based on federal common law. *Id.*

The *Barrowclough* court, however, did not reach the issue of whether federal common law principles of unilateral contract could

**3.** 29 U.S.C. § 1132(a).

apply to a Top Hat plan to enforce a repayment schedule in the plan. This is the issue now before this Court.

## II. *Top Hat Plans as Unilateral Contracts*

This is a case of first impression in the Eastern District of Pennsylvania, but this exact issue was recently faced by the Northern District of California. *See, Carr v. First Nationwide Bank,* 816 F.Supp. 1476 (N.D.Cal.1993). I find the *Carr* decision persuasive and this Court will follow the reasoning in that case.

*Carr* involved very similar facts to the present case. Plaintiffs in *Carr* were former executives of First Nationwide Bank and they sued to enforce contractual rights found in their deferred compensation plan pursuant to Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a). Specifically, plaintiffs sought a declaration that defendant must repay their deferred compensation under the interest formulae in their plan and the payment schedule elected in plaintiffs' deferral notices under the plan. Plaintiffs' worked for the Bank until 1989. The Bank amended the compensation plan in 1992 and changed the repayment schedule that the plaintiffs had selected and it changed the interest formulae under the plan.

Defendant had been paying plaintiffs in accordance with their elected payout schedule until 1992 when defendant decided to pay the remainder in five lump sum installments. Plaintiffs' sought an injunction stopping defendant from violating the repayment schedule and a declaratory judgment ordering defendant to repay the money according to the terms of the plan. Alternatively, plaintiffs sought contract damages for violation of the plan. The court framed the issue as follows:

> This is a case of first impression under ERISA. The question presented is whether the participants in an executive deferred compensation, or "Top Hat", plan may invoke a federal common law theory of unilateral contract to prevent the plan sponsor from amending the plan to the participants' detriment after the participants

have become entitled to repayment under the terms of the plan.

The issue presented in this case is identical to the one addressed in *Carr.*

Plaintiffs in *Carr* argued that under the federal common law of contracts applicable to ERISA plans, the 1992 plan amendments violated their rights under a series of unilateral contracts formed when they filed deferral notices pursuant to the provisions of the plan. 816 F.Supp. at 1485. Moreover, they argued that the expressly reserved power to amend in the Plan did not include the power to change the interest and repayment terms as to income deferred prior to the amendment. *Id.* at 1492–93.

Relying on *Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923 (3d Cir.1985), the court held that the principles of federal common law govern the enforcement of Top Hat plans. *Carr,* 816 F.Supp. at 1487. The court went on to decide that unilateral contract principles that have been applied to qualified or funded pension plans apply to Top Hat plans, which are unfunded and not qualified.

It is well settled that pension benefit plans are unilateral contracts which employees accept by performance and the plan may not be unilaterally amended or modified retroactively by the sponsor. *Kay v. Thrift & Profit Sharing Plan,* 780 F.Supp. 1447, 1457 (E.D.Pa.1991); *Hardy v. H.K. Porter Co.,* 417 F.Supp. 1175, 1183 (E.D.Pa.1976); *Pratt v. Petroleum Prod. Mngmt. Employee Savings Plan,* 920 F.2d 651, 661 (10th Cir.1990); *Morales v. Plaxall, Inc.,* 541 F.Supp. 1387, 1391 (E.D.N.Y.1982).

In *Kay,* the court explicitly followed the Tenth Circuit's holding in *Pratt* that a "pension plan is a unilateral contract which creates a vested right in the employees who accept the offer by continuing in employment the requisite number of years." *Kay,* 780 F.Supp. at 1458 (quoting, *Pratt,* 920 F.2d at 661). Although the above cases all involved funded pension plans and the substantive provisions of ERISA, it is clear from the *Pratt* case and reaffirmed by *Carr* that this conclusion was not based on any ERISA provisions. *Carr,* 816 F.Supp. at 1488; *Pratt,* 920 F.2d at 658–61.

The *Pratt* court decided first that the pension plan was a unilateral contract and therefore unilateral amendment of the plan to defeat plaintiff's fully vested rights was not allowed. 920 F.2d at 661. The court also found that such an amendment violated the substantive provisions of ERISA, but that finding was clearly not the basis for concluding that pension plans are unilateral contracts. *Id.*

■ The *Carr* court found that Top Hat plans resemble employee pension benefit plans as defined in 29 U.S.C. § 1002(2)(A)(ii). That section defines an employee pension benefit plan or a pension plan as:

> any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating benefits under the plan or the method of distributing benefits from the plan.

It is clear that the DEC Plan (DCA and ESRP plans) in this case falls within the definition stated above. Both plans in this case provided for a deferral of income until termination and beyond. Moreover, these plans appear to provide retirement income to the plaintiffs. To the extent Top Hat plans resemble or can be considered pension benefit plans, they too should be considered unilateral contracts.

III. *Federal Common Law of Contract Under ERISA*

■ Federal common law of contract under ERISA mandates that the intended meaning of the parties should be determined, if possible, from the explicit language of the plan. *Alexander v. Primerica Holdings,*

*Inc.,* 967 F.2d 90, 93 (3d Cir.1992). Moreover, if the plain language of the plan is unambiguous, its natural meaning is presumed to be conclusive of the parties' intent. *Carr,* 816 F.Supp. at 1493 (citing, *Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 29–30 (1st Cir.1991)). In light of the above principles, the *Carr* court stated:

> "the policies embodied in ERISA do not prohibit Top Hat plan participants from enforcing their plans as a unilateral contracts which may not be amended without their consent, *so long as the claimed contractual rights arise from the terms of the written top hat plan documents.*"

816 F.Supp. at 1488.[4] (emphasis added).

■ The plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole. *Alexander,* 967 F.2d at 93. The provisions of an ERISA plan should be construed so as to render none nugatory and avoid illusory promises. *Carr,* 816 F.Supp. at 1493 (citations omitted). An interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to one which leaves any part unreasonable or of no effect. *Musto v. American General Corp.,* 861 F.2d 897, 906 (6th Cir. 1988); Res.2d of Contracts § 203.

■ Defendant argued that they had the right to terminate the plan at any time and distribute the funds in lump sums. However, there is no such reservation of power in the plan and this court has already concluded that the DEC plans are unilateral contracts whose rights accrued upon termination of employment.

The Defendant in *Carr* argued that since top hat plans are granted even less protection than welfare plans and since amendment of these plans is not subject to fiduciary and vesting requirements, unilateral contract principles should not apply to prevent a defendant from amending an unfunded pension

---

4. The court stated that it reached its decision with "no small degree of reluctance." However, the court's reluctance was based on the fact that, under the plaintiffs' control, the bank was left in an inferior financial condition. Nonetheless, the court felt compelled to rule in favor of plaintiffs in light of ERISA law and policy and the terms of the plan. *Carr,* 816 F.Supp. at 1486.

plan.[5] This argument was rejected by the court. 816 F.Supp. at 1489. First, the rule that welfare plans are freely amendable means only that the amendment or termination of such plans is not governed by fiduciary duty provisions of ERISA. Second, although amendment of welfare benefit plans is not subject to the vesting requirements of ERISA, it does not give employers blanket authority to amend plans where the plan can be interpreted to provide that benefits are contractually vested or accrued, even if the plan includes an explicit reserved power to amend. *Id.* Thus, although welfare plans are not subject to ERISA's vesting rules, the terms of a plan can provide for vesting. *Id.*

■ The plans in this case are not welfare benefit plans, but the reasoning applies equally in this case. Although unfunded pension plans are not subject to vesting requirements, they can provide for vesting in the plan itself. This conclusion is supported by a Department of Labor's opinion on why Congress exempted Top Hat plans from the substantive provisions of ERISA.[6] The Department of Labor stated:

> Congress recognized that certain individuals, by the virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protection of Title I.

*Carr,* 816 F.Supp. at 1491 (quoting, U.S. Dep't of Labor ERISA Op. 90–14A). The *Carr* court found:

> To the extent that Congress relied on Top Hat participants' power to influence the contents of their plans in denying them the substantive protection of ERISA, it would be absurd to deny such individuals the ability to enforce the terms of their plans in contract ... it would be difficult to imagine what Top Hat participants would

have the power to obtain through negotiation or otherwise—apparently not much more than illusory promises.

816 F.Supp. at 1492. Thus, the court concluded that Top Hat participants may enforce the terms of their plans under federal common law principles of unilateral contract as long as the asserted rights are found in the plan documents and these rights cannot be amended unilaterally after participants become entitled to repayment under the terms of the plan.

### IV. Contractual Rights Under the DCA and ESRP Plans

■ With these principles in mind, this Court examined the plan documents in this case. Although the two plans in this case are substantially similar, I will address them separately at this juncture. Under the 1971 DCA plan, as amended, participants could accept the company's offer by (1) Consent to cancellation of the Company's obligations under the previous stock option plan and (2) Continuing to work for the Company. Under the ESRP plan, participants accepted by filing with ICI a notice of whether and in what amounts they wished to be withheld from their compensation for the following year. The plan in the *Carr* case contained the same requirement regarding deferral notices as the ESRP Plan. 816 F.Supp. at 1492. The court found that:

> Each time plaintiffs submitted deferral notices as provided in the version of the plan then in existence, plaintiffs accepted the offer embodied in the terms of the plan by beginning performance. Unilateral contracts were then formed, based on the contents of the plan and the deferral notices on the dates the notices were submitted. By the time each plaintiff had terminated his employment with the Bank for reasons other than cause he had completed

---

5. Welfare benefit plans, while subject to some disclosure and fiduciary duty requirements, are exempt from the other more stringent requirements of funded pension plans. *See,* 29 U.S.C. §§ 1021–31, 1101–1114.

6. In interpreting ERISA and other statutes, a court may look not only to the legislative history, but also to the views of the agency charged with administering it. *Carr,* 816 F.Supp. at 1491 (citing, *Winterrowd v. David Freedman and Co., Inc.,* 724 F.2d 823, 825 (9th Cir.1984)).

the required performance under the terms of the plan.

*Id.; See,* Res.2d Contracts §§ 45(1), 50(2).[7]

Moreover, under both plans, participants had to give written notice of their repayment schedule to the Secretary of the Company prior to separation with the Company. Once Kemmerer and Jordan each filed their repayment selections with the company prior to their retirement, performance was complete and a binding contract was formed. Thus, this Court finds that contracts were formed and certain rights accrued to the plaintiffs upon completion of the above acts which constituted performance and acceptance.[8]

Specifically, both ¶ 7(a) of the DCA Plan and ¶ 4 of the ESRP Plan clearly set out the method of payment for participants' deferred compensation. The clause states:

amounts deferred ... *shall be paid* ... in five percentage installments ... *unless* ... the Optionee files a written notice with the Secretary of the Company ..., requesting a different form of distribution. *Such notice shall be treated as an election to receive payment in the form requested* ... (emphasis added)

There is nothing ambiguous about this language. The plain meaning of this clause is that the deferred income will be paid in five percentage installments unless plaintiff selected a different method, in which case, the money will be paid by the method selected by the plaintiff.

Just as in *Carr,* these plans contain explicit language regarding how participants may defer compensation and shall be paid such compensation. In fact, this case is even more compelling than *Carr.* In *Carr,* the pension plan contained an explicit provision reserving the right of the employer to terminate and/or amend the plan at any time. 816 F.Supp. at 1493.[9] There is no such explicit reservation of the right to terminate or amend the plan in this case. Thus, there is no problem of construing two contradictory clauses in this case. Although the employer had reserved the power to amend the plan, the court concluded that the more specific distribution clause and interest formulae clause took precedence.[10] *Id.* The *Carr* court aptly stated:

if the plan means what defendants contend, then the Bank reserved to itself unfettered discretion to decide that it would not honor any of the specific promises in the Plan regarding how payments shall be made ... This is a result which basic principles of ERISA federal contract law will not allow.

*Carr,* 816 F.Supp. at 1494. This statement applies equally to the current case. Plaintiffs completed performance prior to the attempted changes by the ICI and therefore, the employer became contractually obligated to repay the deferred compensation in accordance with the interest and repayment terms of the plan in effect at the time of completed performance.

---

7. The court also concluded that even if the plan were deemed a bilateral or executory contract, to be accepted by a return promise, plaintiffs' submission of deferral notices was a return promise. *Carr,* 816 F.Supp. at 1492, n. 11; *See,* Res.2d Contracts § 62(2). It appears that the DCA plan could be considered a bilateral contract, since the participants accepted by agreeing to relinquish their stock options from Atlas in return for deferred income with ICI. Regardless of which theory is applied, the result is still that this Court must examine the terms of the plan to determine if ICI is obligated to repay plaintiffs money according to their repayment schedule.

8. A unilateral contract is formed by an offer, the consideration for which is the performance of an act or forbearance to act. *See,* Restatement (Second) of Contracts §§ 30, 71 (1981).

9. ICI attempts to distinguish *Carr* by claiming there is a difference between termination of a plan and amendment of the plan. Their argu-

ment is not persuasive. The *Carr* court made no such distinction. Even though in *Carr* the plan changes were labelled amendments, they had the same effect as a plan termination. Under either label, the defendants in both cases unilaterally altered plaintiffs' repayment schedule in direct violation of the plans after the right to such repayment had accrued under the plan. Defendant's argument that they had the power to terminate the plan at any time is simply rejected by this Court's conclusion that there was a unilateral contract formed in this case and upon completion of performance, the plaintiffs became entitled to repayment based on the distribution schedule they selected.

10. The power to amend the plan was also limited by the phrase "without canceling, reducing or altering any outstanding awards thereunder." *Carr,* 816 F.Supp. at 1494.

Implying a right to terminate an ERISA plan and alter accrued contract rights without any explicit provision to that effect would nullify the method of payment clauses in the DEC plans. This would be in direct violation of established federal common law principles of contract interpretation established under ERISA. This court will not find a right to amend or terminate this plan where none exists in the language of the contract that would have the effect of rendering an explicit contract provision nugatory and illusory.

## V. *Damages*

 Defendant argues that plaintiff's are seeking extra-contractual damages and that these damages are not recoverable under ERISA. While it is true that extra-contractual damages are not recoverable under ERISA, plaintiffs' damages are not extracontractual. One of the principal cases relied on by defendant is *Harsch v. Eisenberg*, 956 F.2d 651 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). Plaintiffs in *Harsch* argued that they were attempting to enforce their rights under their pension plan to proper treatment by a plan fiduciary under 29 U.S.C. § 1104(a)(1). 956 F.2d at 655. Plaintiffs did not have an explicit contractual right to payment at any particular time, but the plan administrator had a fiduciary duty imposed by ERISA to process their claim and pay their benefits within a reasonable time. Consequently, plaintiffs' claim was not for a breach of any specific terms of payment in the plan. The court concluded that the "language of section 502(a)(1)(B) ... appears to limit beneficiaries to *contractual* claims by providing only for actions *based upon or arising under the terms of the plan*." [11] (emphasis added).

Plaintiffs' claims in this case arise under the terms of their plan. They are suing for lost benefits caused by defendant's breach of the deferred compensation plan. Plaintiffs' allegedly incurred greater tax liability based on defendant's lump sum payments and thus, they lost the benefit of their selected repayment schedule. Any other conclusion would nullify the enforceability of the repayment clause and make that promise illusory.

## CONCLUSION

Top Hat plans can be enforced under ERISA through application of federal common law principles of unilateral contract as long as the asserted contract rights are found in the terms of the plan. Thus, plaintiffs can enforce the terms of their Deferred Executive Compensation Plans under ERISA and federal common law principles of contract. Specifically, I find that plaintiffs can enforce the repayment schedule selected under their deferred compensation plans based on the explicit terms of the plans at issue.

An order follows.

## *ORDER*

AND NOW, this 4th day of January, 1994, upon consideration of both plaintiffs' and defendant's Motions for Summary Judgment and responses thereto, it is hereby ORDERED and DECREED that Defendant's Motion for Summary Judgment as to liability and damages is DENIED and Plaintiffs' Motion for Summary Judgment as to liability is GRANTED.

It is further ordered that Plaintiffs' Motion to Strike is DENIED as moot.

IT IS SO ORDERED.

---

**11.** The Seventh Circuit relied on *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), to reach its conclusion. This case was limited to cases involving breaches of fiduciary duties and it involved a claim for emotional distress. Just as in *Harsch*, these claims did not arise under the terms of the plan and therefore, were considered extracontractual damages.