**Kenneth A. BLACK, Plaintiff,**

v.

**BRESEE'S ONEONTA DEPARTMENT STORE, INC. SECURITY PLAN and Bresee's Oneonta Department Store, Inc., Defendants.**

**BRESEE'S ONEONTA DEPARTMENT STORE, INC. SECURITY PLAN and Bresee's Oneonta Department Store, Inc., Third–Party Plaintiffs,**

v.

**Gary P. DiCRESCE, Individually and doing business as Gary P. DiCresce and Associates, Third–Party Defendant.**

No. 94–CV–442.

United States District Court,
N.D. New York.

March 19, 1996.

Coughlin & Gerhart, Richard Mertens, Binghamton, N.Y., for Plaintiff.

James E. Konstanty, Oneonta, N.Y., Helm, Shapiro, Anito & McCale, P.C., Mark D. Lansing, Albany, N.Y., for Defendants/Third–Party Plaintiffs.

Smith, Sovik, Kendrick & Sugnet, P.C., James A. O'Shea, Syracuse, N.Y., for Third–Party Defendant.

## MEMORANDUM DECISION AND ORDER

McAVOY, Chief Judge.

Plaintiff Kenneth A. Black filed this action pursuant to the Employee Retirement. Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, claiming that certain pension plan benefits owed and due from defendant Bresee's Oneonta Department Store, Inc Security Plan were not paid by his employer, defendant Bresee's Oneonta Department Store, Inc. By a decision from the bench on June 23, 1995, this Court granted plaintiff's Motion for Summary Judgment against defendant Bresee's, concluding that Bresee's was in fact obliged to fulfill its obligations to plaintiff Black under Bresee's Security Plan. An order granting plaintiff Black's Motion for Summary Judgment was entered on July 6, 1995.

In turn, Bresee's filed a third-party Complaint against Gary P. DiCresce, the insurance agent who conceived of, designed and serviced Bresee's Plan, claiming under various theories that third-party defendant DiCresce was actually liable for Bresee's obligations and liabilities under the Plan.

Plaintiff's damages and the third-party action were tried without a jury on August 10, 1995. Because the Court had already concluded that Bresee's was liable to Black under the Plan, the trial concerned only the amount of damages due to plaintiff, whether or not an award of attorney's fees to plaintiff was appropriate, and the third-party action between third-party plaintiff Bresee's and third-party defendant DiCresce. The initial post-trial briefing regarding the third-party action was inadequate, which led the Court to request further briefing from the third-parties[1] in November of 1995. This supplemental briefing was completed on January 25, 1996 and the Court now issues this Memorandum Decision and Order containing the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1. On July 1, 1979, Bresee's Oneonta Department Store, Inc. ("Bresee's") adopted the Bresee's Oneonta Department Store, Inc. Security Plan (ex. D–1) ("Plan"). Under the Plan as adopted in 1979, a participant became entitled to a full retirement benefit upon (a) completing 5 years of service with Bresee's, (b) contributing over 10 years to the Plan, and (c) attaining the age of 65. Employees terminated before retirement had their benefits determined under portability provisions, subject to continued contribution for the balance of the required 10 years. Effective July 1, 1985, the Plan was amended to require 5 years of participation by employees age 60 and over, and increased the vesting schedule under the portability provisions. (ex. D–4). That amendment also increased the retirement benefit for Class G participants to $800 per month for 15 years. Benefits were guaranteed for 10 years in the event of the death of a participant following retirement. Benefits were to commence upon the retirement date, which was to be the first date of the month following the participant's 65th birthday.

2. The Plan also had a provision which purported to give Bresee's the right to modify or discontinue the Plan as required. The provision stated:

> FUTURE OF PROGRAM—Although this plan would not have been adopted if it were not expected to be continued indefinitely, the right to modify or discontinue the plan has been reserved by our company. For example, it may become necessary to conform to regulatory changes or interpretations, adjust to any significant variations in actuarial assumptions, or to protect against future conditions not now foreseen.

3. Plaintiff Kenneth Black ("plaintiff") began his employment with defendant Bresee's Oneonta Department Store, Inc on October 3, 1977. Black enrolled in the Plan as a Class G participant which initially entitled him to a retirement benefit of $700 per month for 15 years. Under the aforementioned 1985 amendment plaintiff's retirement benefit was increased to $800 per month for 15 years (as admitted in Deft. Bresee's Answer, ¶ 2). Plaintiff contributed to the Plan for 10 years in the aggregate amount of $14,560 as required for Class G members. In May of 1993, plaintiff advised Bresee's of his intent to retire. Plaintiff was then notified that Bresee's intended to terminate the Plan. The Plan was in fact terminated in June of that year, and plaintiff was given back approximately the amount he had contributed to the Plan.

4. It was not disputed anywhere in the record, at oral argument on plaintiff's Motion for Summary Judgment, or at trial, that plaintiff had fulfilled all conditions for retirement as embodied in the terms of the Plan.[2] (See I, ¶ 1).

5. At trial, third-party plaintiff Bresee's presented the testimony of two witnesses: Mark Bresee, a Bresee's family member and a twenty-seven year Bresee's employee who was president of the corporation at the time it discontinued business, and Phillip Bresee,

---

1. No further briefing was required or requested as to plaintiff's claims, for which the deadlines for motions and post-trial submissions had long expired.

2. It was nowhere disputed that plaintiff had completed five years of service with Bresee's, had contributed to the Plan for ten years, and had reached the retirement age of 65.

another Bresee family member and long-time employee and former president of the corporation. Bresee's also introduced thirty-one documentary exhibits. Third-party defendant called no witnesses and introduced no exhibits. The Court finds that the evidence at trial established the following conduct by third-party defendant DiCresce:

(a). In 1979, DiCresce approached Bresee's and proposed to establish for its employees a non-qualified pension plan to be funded through Bresee's purchase and maintenance of life insurance policies on those employees as sold by DiCresce (R. at 5, 35–37, 76–77). DiCresce prepared and submitted documentation to Bresee's in support of his proposal (R. at 5–17; Ex. D1–D4);

(b). In making that offer, DiCresce held himself out to have professional expertise and knowledge of pension plans and ERISA requirements (R. at 8–9, 17);

(c). In the course of that proposal and throughout the existence of the Plan, DiCresce represented that the plan was: (1) nonqualified (*i.e.*, not eligible for favorable tax treatment under the Internal Revenue Code); (2) exempted from ERISA; (3) self-funding (following Bresee's initial investment in the life insurance policies) and (4) terminable unilaterally and retroactively (R. at 6, 9, 14, 17, 22, 25, 76–78).

(d). DiCresce maintained ongoing involvement in the plan by:

(i) preparing all plan documents, including cost information and a summary benefit and contribution schedule and arranging for weekly deductions;

(ii) informing employees of the plan and enrolling new employees. DiCresce sold life insurance policies for each employee, which were purchased by Bresee's;

(iii) preparing and explaining to employees the plan summary document;

(iv) preparing and issuing certificates of participation for employees;

(v) calculating each employee's necessary contribution to the plan and collecting required insurance premiums from Bresee's and in some instances financing premiums owed on policies;

(vi) At Bresee's request, preparing and implementing amendments and modifications to the plan in 1983, 1985 and 1990.

6. The record further establishes that Bresee's adopted the Plan relying, at least in part, on DiCresce's representations that it could at all times terminate the *plan* at no detriment to itself. Bresee's did, however, have its independent accountants review the proposal, at least regarding the tax consequences of the Plan. (R. at p. 52, 53–54, 69–70; *compare* R. at 14–16). Bresee's also sought advice from their attorneys during the Plan's existence, at least at the point when they sought to terminate the plan. (R. at 55–56).

7. DiCresce modified the plan in 1983 and 1985 at Bresee's request and in an attempt to reduce the Plan's carrying costs, which exceeded DiCresce's initial representations (R. At 24–27). DiCresce made modifications to the financial structure of the plan and the underlying insurance policies in 1990 as well, again at the request of Bresee's (R. at 58–60).

8. In 1992–93, as a result of the fact that the plan had never fulfilled its self-funding promise, and because the cost of maintaining the plan to Bresee's was far higher than DiCresce had estimated, Bresee's again sought a meeting with DiCresce to discuss modifications. At that time DiCresce repeated his assertion that Bresee's could do anything it wanted with the plan, including termination (R. at 43). DiCresce suggested that once again Bresee's redo the insurance policies in an attempt to reduce plan costs. At that point Mark Bresee decided to fund the plan through another insurance agent. Bresee's ultimately did so, resulting in a large cost reduction. Bresee's continued to maintain some policies with DiCresce, however, but only because by that time certain participating employees were otherwise uninsurable (R. at 43–46; Ex. D–13).

9. Bresee's last contact with DiCresce in relation to administration of the plan was sometime in 1992–93 (R. at 55). In June of 1993, after consulting with their attorney, Bresee's discontinued the Plan by refunding to participating employees their paid-in con-

tributions. (R. at 9, 35–38, 62). At this time Bresee's also attempted to deny plaintiff Black his vested benefits under the Plan. Bresee's did not consult with DiCresce regarding either their 1993 termination of the plan or their attempt to deny plaintiff his vested benefits. (R. at 54–56).

10. In July of 1994 Bresee's ceased its business operations (R. at 37–38).

## II. CONCLUSIONS OF LAW

### A. Bresee's Liability on Plaintiff's Claims:

1. In its decision from the bench on June 23, 1995, the Court reached the following conclusions of law:

(a). That Bresee's plan fell within ERISA's definition of an employee pension benefit plan. *See* 29 U.S.C. § 1002(2)(A) ("any plan … maintained by an employer … that … (I) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond…."); *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989);

■ (b). That within the categories of employee pension benefit plans, Bresee's Plan was of the type commonly referred to as a "top hat" plan, because it was unfunded and existed primarily to provide benefits to a select group of management or highly compensated employees.[3] *See* 29 U.S.C. § 1101(a). The Court further concluded that, as a top hat plan, the Plan was exempted from the substantive provisions of parts 2, 3, and 4 of Title I of ERISA (regarding participation, vesting, funding and fiduciary responsibility). 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1); *see Fasco Industries, Inc. v. Mack,* 843 F.Supp. 1252, 1255 (N.D.Ill.1994). Although ERISA's substantive provisions do not apply, however, courts have nevertheless held that such plans re-

main subject to the enforcement provisions of ERISA. *See Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923, 930–31 (3d Cir. 1985); *Fasco Industries,* 843 F.Supp. at 1255;

■ (c). That the federal common law developed under ERISA generally governs the enforcement of top hat plans, *See Kemmerer v. ICI Americas, Inc.,* 842 F.Supp. 138, 142 (E.D.Pa.1994); *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1485 (N.D.Cal.1993); *see also Barrowclough,* 752 F.2d at 935–37, and that the unilateral contract principles that have been applied by federal courts to "qualified" or "funded" pension plans (which are controlled by the substantive provisions of ERISA) may also govern unfunded, non qualified, top hat plans, but only if the terms of these "unilateral contracts" are clear from the formal written plan documents. *See Kemmerer,* 842 F.Supp. at 142; *Carr,* 816 F.Supp. at 1485.[4] Thus, the Court concluded that this Plan's clear and plain terms (*see* § I, ¶ 1) constituted an offer for a unilateral contract and a participant's performance under the plan's terms created a binding contract. *Carr,* 816 F.Supp. at 1492; *see Restatement (Second) of Contracts* §§ 30, 71 (1981);

(d). That it was undisputed in both in the record and at oral argument that plaintiff, by his full performance under all the plan's terms, had fully accepted the unilateral offer embodied in the terms of the Plan.[5] Accordingly, plaintiff's rights under the unilateral contract had vested, at least contractually, and he was entitled to the benefits promised therein;

■ (e). That the discontinuance provision in the plan (§ I, ¶ 2) could only operate *prospectively,* not *retrospectively,* since only that reading would give lawful meaning to all the provisions in the Plan. This conclusion followed from the following principles: that

---

3. The Court reached this conclusion at least as to the portion of the Plan relevant to plaintiff. The plan's deficiencies make overall categorization of the Plan in its entirety extremely difficult.

4. *See Morales v. Plaxall, Inc.,* 541 F.Supp. 1387, 1391 (E.D.N.Y.1982) (Pension benefit plans are unilateral contracts which employees accept by

performance and such plans may not be unilaterally amended or modified retroactively by the sponsor).

5. Plaintiff had completed five years of service with Bresee's, had contributed to the Plan for ten years, and had reached the retirement age of 65. (*See* § I, ¶ 4).

the plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole, *Kemmerer,* 842 F.Supp. at 143; *Alexander,* 967 F.2d at 93; that the provisions of an ERISA plan should be construed as to render none nugatory and avoid illusory promises, *Kemmerer,* 842 F.Supp. at 143; *Carr,* 816 F.Supp. at 1493; and, that an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to one which leaves any part unreasonable or of no effect. *Musto v. American General Corp.,* 861 F.2d 897, 906 (6th Cir. 1988). In short, after applying the foregoing principles to the Plan's plain language, the Court concluded that "a short general provision stating that the [employer] 'may' amend cannot operate to nullify numerous other specific provisions regarding how, when and at what rates of interest the [employer] 'shall' repay plaintiffs' deferred income." *Carr,* 816 F.Supp. at 1493–94. It followed then, that Bresee's attempt to exercise the discontinuance provision could have no effect on those participants who had already fully performed the terms of the agreement, but rather, could effect only those who had failed to fully perform under the agreement.

## B. Plaintiff's Damages:

■ 1. Applying the conclusions of law contained in § II, ¶¶ 1(a)–(e) to the findings of fact contained in § I, ¶¶ 1–3, leads to the conclusion that defendant Bresee's is liable to

plaintiff under the terms of the Plan as follows: [6]

| | | |
|---|---|---|
| (a). Past due payments of $800. per month from September 1, 1993 through March 1, 1996 inclusive, equaling: | | $24,800.00 |
| together with interest thereon [7] from the respective dates of payment, equaling: | | $ 1,617.98 |
| and costs [8] in the amount of: | | $ 604.28 |
| for a total award of | | $27,022.26 |

**(b).** Payment of **$800. per month** from March 1, 1996 through the earlier of August 1, 2008, OR, the date of Mr. Black's death; and,

**(c).** If Mr. Black dies prior to August 1, 2003, payment of **$800. per month** from the 1st day of the month following his death through August 1, 2003, to his wife, Rosemarie Black, if living, and, if deceased, to his children, in equal shares, in accordance with plaintiff's election under the plan. (*See* § I, ¶ 1 *supra*).

Nothing in plaintiff's medical history, as elicited on cross-examination by defendant at trial alters these conclusions. Likewise, nothing in the pre–1985 amendment Certificates of Participation (Ex. D–11, 12) which defendant produced at trial establishes that plaintiff was not a participant in the Plan, or, that plaintiff was not subject to the 1985 amendment which raised class G benefits to $800. Per month.

## C. Plaintiff's Attorney's Fees:

■ On July 25, 1995 plaintiff filed a motion for attorney's fees. In that motion plaintiff fully analyzed and argued the five factors that the Court should consider re-

---

**6.** Defendant Bresee's supplemental post-trial briefing, filed upon the Court's request for further briefing on the third-party issues *only*, attempts to raise for the first time issues as to plaintiff's damages and requests for attorney's fees which were not argued on motion or at trial. Because Bresee's failed to raise these issues by pre-trial motion, at trial, or in its post-trial briefing, it would be improper for the Court to consider this new argument and evidence so long after the close of proof.

Furthermore, even were the Court to entertain argument on these issues raised for the first time so long after the trial's conclusion, Bresee's provides no support for its position that plaintiff's recovery should be limited to the amount of Bresee's available general assets.

**7.** "As a general rule, a court has wide discretion under § 409(a), pursuant to its authority to award 'appropriate relief,' to award prejudgment

interest.... Prejudgment interest is not intended to penalize the trustee but serves as compensation for the use of the money withheld." *Diduck v. Kaszycki & Sons Contractors Inc.,* 974 F.2d 270, 286 (2d Cir.1992) (citations omitted). None of the parties has contested plaintiff's request for prejudgment interest and the Court has considered the same factors discussed in awarding attorney's fees (*see* § II(C) *supra*) in rendering this award. Interest was computed pursuant to 26 U.S.C. § 6621 at the Secretary's adjusted prime rate as of February 28, 1996, in this case 4.89%. *Id.*

**8.** *See* plaintiff's uncontroverted attorney's fees affidavit reflecting costs in this amount. (Bouman Aff. of 7/25/95 at 2).

garding whether to grant attorney's fees under 29 U.S.C. § 1132(g). *See Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 872 (2d Cir.1987) [9]; *Ford v. New York Central Teamsters Pension Fund,* 506 F.Supp. 180 (W.D.N.Y.1980) *aff'd* 642 F.2d 664 (2d Cir.1981). Neither defendant Bresee's nor third-party defendant DiCresce made any response to plaintiff's motion for fees. At trial, only defendant Bresee's addressed plaintiff's renewed fees motion and at that time Bresee's raised no objection to *granting* the attorney's fees Motion, but objected *only* to the hourly rate at which plaintiff's attorney had calculated his fees. Finally, in their post-trial briefs defendant Bresee's renewed their objections to the rate of calculation employed, but again raised no argument and pointed to nothing in the record in opposition to granting attorney's fees.[10] (Deft. Bresee's Post Trial Brief at 20).

■ The decision of whether to award fees under § 1132(g)(1) lies within the discretion of the district court. *See Fase v. Seafarers Welfare and Pension Plan,* 589 F.2d 112, 116 (2d Cir.1978). Notwithstanding both third-parties' complete failure to timely address plaintiff's motion, the Court has fully considered the *Chambless* factors, albeit with only plaintiff's comprehensive briefing for guidance, and concluded that attorney's fees are appropriate here.

As the § II, part A analysis *supra* establishes, the Court has found that Bresee's actions toward Black were unlawful, and that their reading of the clause they have purported to rely upon in taking those actions was plainly unreasonable. While the Court is reluctant to characterize Bresee's conduct as plain bad faith, clearly Bresee's conduct reflects a large measure of culpability. The Court is also cognizant that Bresee's actions

were undertaken during a time of extreme financial hardship for the corporation: the Court finds it reasonable to believe that an award of attorney's fees here may well serve to deter other financially strained businesses from taking such unreasonable actions when tempted to do so during uncertain economic times. This is particularly true where, as here, a corporation takes unilateral action against an *individual* plan participant who must then draw on his own resources, if any, to seek review of the action. If the end result is nothing more than an award of that which plaintiff was plainly entitled to some three years ago, there is no downside whatsoever to attempting to preserve corporate assets at the expense of entitled individual employees. As to the next factor, given the Court's conclusions that Bresee's unreasonably sought to deprive plaintiff of his clearly vested and rightful benefits, the relative merits of the parties' positions weighs heavily in plaintiff's favor. Finally, plaintiff has conferred no common benefit on other plan members.

While three of the foregoing four factors weigh heavily in plaintiff's favor, the Court must also consider Bresee's ability to pay. It is clear from the record that Bresee's has discontinued business and therefore its ability to pay is extremely diminished. There is no evidence that Bresee's is completely unable to pay, however, and given the important deterrence values identified above, as well as Bresee's inequitable conduct toward plaintiff, the Court finds that this factor alone should not absolve Bresee's of their obligations in this regard. Balancing the factors the Court finds that an award to plaintiff of one-half his attorney's fees will best satisfy the equities on both sides.

9. Those factors are: 1. the degree of the offending party's culpability or bad faith; 2. the ability of the offending party to satisfy an award of attorney's fees; 3. whether an award of fees would deter others from acting similarly under like circumstances; 4. the relative merits of the parties positions; and 5. whether the action conferred a common benefit on a group of pension plan participants. *See Chambless* at 871.

10. As detailed in notes 1 and 6 *supra,* after the close of trial and expiration of the deadline for

post-trial briefing, the Court ordered supplemental briefing from the third-parties on the inadequately briefed third-party issues only. Plaintiff has rightly objected to defendant Bresee's attempt in that supplemental briefing to reopen evidence and argument as to plaintiff's action. The Court will not, in fairness to plaintiff, consider defendant Bresee's untimely submissions in this regard.

Plaintiff's uncontroverted affidavit indicates that plaintiff's attorneys have expended 116.5 hours on this matter and that their hourly rate is $150.00 per hour, for a total of $17,475.

The most useful starting point for determining the amount of reasonable attorney's fees is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). In general, the rate used in a determination of the amount of attorneys' fees to be awarded "should be calculated according to the prevailing rates in the community *for similar services by lawyers of reasonably comparable skill, experience and reputation.*'" *Cefali v. Buffalo Brass Co.*, 748 F.Supp. 1011, 1018 (W.D.N.Y.1990) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058–59 (2d Cir.1989), *cert. denied*, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990)) (emphasis in original).

This Court has previously considered the prevailing rates in the Northern District of New York, as instructed to by *Polk v. New York State Dep't of Correctional Servs.*, 722 F.2d 23, 25 (2d Cir.1983), and concluded that $150. is a reasonable and customary hourly rate for partners practicing in this area. *See Greenwich Citizens Comm. v. County of Warren*, 1994 WL 631212 (N.D.N.Y.1994). The Court is mindful also that ERISA presents a practice area of some complexity.

Applying the above rates to the instant case, the Court arrives at the same figure calculated and requested by plaintiff: $17,475.00. Reducing this lodestar by half under the balanced factors discussed *supra*, results in an award to plaintiff of attorney's fees in the amount of $8,737.50

### D. The Third–Party Action:

In support of its third-party action, Bresee's asserts contribution and indemnifi-

cation and equitable and promissory estoppel as bases [11] for its claim to recovery over against DiCresce for the full extent of its liability to plaintiff Black.

### Liability as a Fiduciary:

**1.** While the Second Circuit has indicated that "the traditional trust law right to contribution must also be recognized as a part of ERISA," *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir.1991), it is also clear that generally, "traditional trust law provides for a right of contribution among defaulting *fiduciaries.*" *See also, Mertens v. Hewitt Associates*, 508 U.S. 248, 262, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993) ("Professional service providers such as actuaries become liable for damages when they cross the line from advisor to fiduciary."). It follows, then, that Bresee's might have some basis for recovery, at least on its contribution/indemnification claims, and perhaps on other bases, if DiCresce can properly be characterized as a Plan fiduciary under ERISA principles.

**2.** A party is a "fiduciary" of a retirement plan:

> to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation ... with respect to ... such plan, or has any authority or any responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

"Whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir.1987). However, a party "need not have absolute

---

**11.** Third-party plaintiff was precluded from presenting expert testimony at trial, on DiCresce's motion, based on their failure to comply with N.D.N.Y. Local Rule 26.3. In the absence of such evidence third-party plaintiff's were unable to pursue a negligence theory. *See Parksville*

*Mobile Modular, Inc. v. Fabricant,* 73 A.D.2d 595, 422 N.Y.S.2d 710 (2d Dept.1979) (discussing requirement of some evidence of the state of the law at the time advice was given in order to establish whether advice reflected professional's error in judgment for which there is no liability).

discretion with respect to a benefit plan in order to be considered a fiduciary." *Id.* On the contrary, fiduciary status exists "with respect to any activity enumerated in the statute over which the [party] exercises discretion or control." *Id.; See also, Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1416–17 (2d Cir.1985) (ERISA permits employers to wear "two hats"—employer in some cases and fiduciary in others).

While the term "fiduciary" should be broadly construed, the Court finds that even the broadest construction of the instant record will not support Bresee's contention that DiCresce was a fiduciary of the Plan. Rather, the Court finds *Consolidated Beef Industries v. New York Life Insurance,* 949 F.2d 960 (8th Cir.1991), almost indistinguishable, both factually and analytically, from the present case.

First of all, Bresee's Oneonta Department Store, Inc. is expressly designated as "Plan Administrator and Sponsor" in the plan documents, (Ex. D1–2), and nothing in any plan document either refers to DiCresce or purports to invest in DiCresce any discretionary power or control over the plan. While the Court finds as a fact that DiCresce initially approached Bresee's with the Plan proposal, it is equally clear that DiCresce approached Bresee's as a life insurance salesman who was marketing the plan for Bresee's ultimate consideration as to whether or not the plan should be adopted: "the mere marketing of the ... plan does not implicate fiduciary conduct." *Id.* At 965; *compare Thomas, Head & Greisen Employees Trust v. Buster,* 24 F.3d 1114, 1118 (9th Cir.1994) (distinguishing *Consolidated Beef* because of the "important distinction between an agent or broker selling uniform commercial products of a reputable insurance company and the sale of deed of trust notes secured by real property with highly individualized characteristics"), *cert. denied* —— U.S. ——, 115

S.Ct. 935, 130 L.Ed.2d 881 (1995). The Court notes also that Bresee's called upon other professionals to assess aspects of the plan before adopting it. (§ I, ¶ 6).

Furthermore, the Court finds that DiCresce was not providing "investment advice" as much as he was marketing his company's products, *i.e* the life insurance policies which were theoretically to provide the basis for Bresee's Plan. Indeed these policies represent the only plan "investments" and the only "advice" the Court can find in the record is DiCresce's continuing offer to sell his products as a means of funding the Plan. It is likewise undisputed that Bresee's—the named plan administrator and sponsor—paid no advisory fee to DiCresce and that the only compensation DiCresce received was his commissions from the sale of the policies.

Much of the conduct that Bresee's points to in seeking to establish DiCresce's status as a fiduciary reflects only DiCresce's ongoing activities in selling and maintaining the Plan participant's life insurance policies.[12] Nor does DiCresce's involvement in the various Plan amendments advance Bresee's position.[13] It is undisputed in the record that it was Bresee's who sought each and every amendment, and then only after Bresee's had independently concluded that DiCresce's products were not performing as Bresee's had anticipated. Indeed, nothing reflects Bresee's independent decision-making and DiCresce's lack of discretionary power as much as Bresee's unilateral decision to ultimately cancel their insurance policies with DiCresce and to move all their business (to the extent that it was possible for them to do so at that time) to another agent. (*See* § I, ¶ 8 *supra*).

The remainder of the conduct Bresee's points to reflects only routine ministerial actions by DiCresce which do not support a finding that DiCresce acted in a fiduciary

**12.** Bresee's claims *inter alia* that DiCresce: "(3) calculated each employee's necessary contribution to the plan; (4) prepared a summary benefit and contribution schedule; (5) ... arranged for weekly deductions ...; ... (8) selected life insurance policies for each employee purchased by Bresee's and performed physicals; (10) ... collected required insurance premiums from Bre-

see; [and] (11) financed premiums owed on policies." (Bresee's Supp. Trial Memo. At 18–19).

**13.** According to Bresee's DiCresce "(12) prepared and made all amendments or modifications to the plan in 1983, 1985 and 1990." (Bresee's Supp. Trial Memo. At 18–19).

capacity.[14] In short, there is no evidence of DiCresce taking any discretionary action in reference to the plan, or indeed ever having the *power* to take any such actions.

## Liability as a Third Party:

■ 3. Bresee's further claims, however, that even in the absence of any contractual basis for indemnity and contribution, and even assuming that DiCresce was not a fiduciary of the plan, DiCresce can still be liable as a third-party under either equitable or promissory estoppel, or application of some form of non-fiduciary contribution or implied indemnity theories. Given ERISA's broad preemption, however, application of these theories to a third party, based on the instant facts is, at best, troublesome. *See, i.e. Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) ("We have recognized that under 'extraordinary circumstances' principles of estoppel can apply in ERISA cases."); *Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1016 (S.D.N.Y.1995) (holding that "ERISA preempts state law causes of action regarding top hat plans"); *Ransom v. Administrative Committee,* 820 F.Supp. 1429, 1431 (N.D.Ga.1993) ("Because ERISA preempts all state law common law claims relating to employee benefit plans, the Court must look to federal law of equitable estoppel to determine if plaintiff's claim is futile"); *compare, Williams v. Bridgestone/Firestone, Inc.,* 954 F.2d 1070, 1073–74 (5th Cir.1992) (disallowing application of estoppel principles); *see generally, Diduck* 974 F.2d at 288 ("ERISA's preemption clause is 'conspicuous for its breadth' ... representing Congress' aim to establish as area of 'exclusive federal con-

cern' the regulation of employee benefit plans.") (citations omitted).

Even assuming that such claims are viable under the federal common law of ERISA[15] as applied to these facts, however, for Bresee's to prevail they would need to have established at trial, at minimum: (i) a misrepresentation or unfulfilled promise by DiCresce; (ii) their own reasonable reliance on that misrepresentation or unfulfilled promise; and (iii) damages flowing from that reasonable reliance. *See Haeberle v. Board of Trustees,* 624 F.2d 1132, 1139 (2d Cir.1980) ("The principle of estoppel permits recovery when 'a representation of fact made to a party who relies thereon with the right to so rely may not be denied by the party making the representation if such denial would result in injury or damage to the relying party.' ... The party who seeks to invoke estoppel [must] prove every element of the doctrine.") (*quoting* 1 *Williston on Contracts,* § 139 at 600 (3d Ed.1957)); *Chemung Canal Trust,* 939 F.2d 12 ("The 'right of action' for contribution is no more than a procedural device for equitably distributing responsibility for plaintiff's losses proportionally among *those responsible for the losses,* and without regard to which particular persons plaintiff chose to sue in the first instance.") (emphasis added). The Court finds that as a matter of law, Bresee's has failed to establish the existence of the three necessary estoppel conditions, or, that in any other legal sense, DiCresce is "responsible for the losses" plaintiff has suffered.

### (i). Misrepresentation or Promise:

■ First, third-party plaintiff must show either an affirmative misrepresentation

---

**14.** That DiCresce "(1) prepared all plan documents, including cost information; (2) informed employees of the plan ... [and] in fact, DiCresce had discretion to sign up employees; ... (6) prepared letter notifying Secretary of the Department of Labor of the plan; (7) prepared and explained to employees plan summary document; ... (9) over entirety of the Plan, prepared and issued certificates of participation for employees."

Finally, Bresee's concludes that DiCresce "(13) annually reviewed the Plan, [and] made changes (in his discretion in certain instances)" (*See* Bresee's Supp.Trial Memo. At 18–19). Bresee's fails, however, to articulate what these discre-

tionary changes were and makes no citation to the record in support thereof.

**15.** *But See, Chemung Canal Trust,* 939 F.2d 12 (Altimari, J., dissenting) ("I do not believe that in this instance we can, in effect, legislate that Congress intended to leave open to the courts the right to fashion common law remedies of indemnification and contribution under ERISA."); *Diduck,* 974 F.2d at 281 (recognizing cause of action in favor of plan participant, against third-party who knowingly participates in ERISA fiduciaries breach of fiduciary duties, but noting that "broadening rights provided in a statute under the guise of federal common law should only be undertaken with great caution").

of fact (to invoke equitable estoppel), *Lee* 991 F.2d at 1010, or a clear and unambiguous promise (to invoke promissory estoppel). *Aquilio v. Police Benev. Ass'n of N.Y. State Troopers,* 857 F.Supp. 190, 199 (N.D.N.Y. 1994). In this matter, then, Bresee's must show that DiCresce either misrepresented or promised to them that they could cancel plaintiff Black's (or any fully performing participant's) otherwise vested benefits. The Plan clause that Bresee's relies on to make this showing does not establish such a misrepresentation or promise. (*see* § I, ¶ 2 *supra* ).

That clause, entitled "Future of *Program,* " (emphasis added), speaks only in terms of the "the right to modify or discontinue *the plan* "[16] (Ex. D–1) (emphasis added). In fact, Bresee's did successfully exercise the option outlined in this clause and discontinue the plan as to numerous non-vested employees. There is no evidence in the record that termination of, or non-payment to, vested participants was either discussed or even contemplated by the parties, let alone understood to be embedded in the contested clause.

Furthermore, the Court finds nothing in the clause's plain language or fair implication which could reasonably be interpreted as a representation or reassurance by DiCresce that Bresee's could deny vested benefits to a participating employee who had fully performed under the Plan's terms. Bresee's professed reading partakes more of *post hoc* wishful thinking than it does of a reasonable and realistic interpretation of their duties and obligations under the unambiguous plan language they had adopted. *See Aquilio,* 857 F.Supp. at 210 (estoppel claim fails "due to lack of affirmative misrepresentation."); *compare, Kane v. Aetna Life Ins.,* 893 F.2d

1283 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (ERISA-estoppel claim permitted to proceed where plan held ambiguous).

### (ii). Reasonable Reliance:

Second, even assuming that the clause could be reasonably understood as a statement by DiCresce to Bresee's that it could deny benefits to a vested participant, Bresee's alleged reliance on that statement alone is simply unreasonable given the facts and circumstances here.

It is undisputed that Bresee's sought to terminate Black's vested benefits some fourteen years after adopting the plan—and fourteen years after DiCresce's statements were first made. The record further reflects that, at various times, Bresee's consulted both accountants and attorneys in assessing their options under the plan. (*See* § I, ¶ 6). Finally, the record shows that Bresee s three times caused the original plan to be amended, and ultimately severed (at least to the extent that it could) third-party defendant DiCresce's underwriting relationship to the plan.

Plaintiff Black was apparently not vested at the time Bresee's ended its relationship with DiCresce and nothing in the record indicates that Bresee's could not have exercised the clause and terminated the plan (and so any potential obligations to Black) at that time, or indeed at any time prior to Black's vesting. Furthermore, it is clear that at *some* point during these fourteen years, and certainly upon realizing that the plan was not performing as expected in other respects, there fell upon Bresee's an independent duty to fully explore its lawful options and not to continue to rely solely on a single clause (if indeed this is what Bresee's did). Had Bre-

---

**16.** The same is true of the oral statements by DiCresce that third-party plaintiffs testified to at trial: as proven, those statements made reference only to modification and termination of *the plan. See, i.e.* R. at 43–44:

A. Well, it was in regard to—I knew we had to do something and at that point he said' well, what do you want to do? We can change it. We can make it do anything you want to do and I just had—at that point I had all I wanted to do with Gary DiCresce and at that point I contacted a different person to try to fund it.

Q. In that context did the subject of termination come up as one of the options?
A. Well, at that time we were in the financial crunch. I told him we have to do something. We have to terminate this plan or we have to do something that we can afford and that's when he started talking about redoing the insurance. So I would say I didn't talk to him much more than that.

see's timely met this duty to themselves and their participating employees, they would have discovered that they presently enjoyed the option of further modifying or terminating the plan, but that they delayed taking such action at their peril. Bresee's failed, however, to undertake any such reasonable inquiry. To the extent that Bresee's professed reliance led to the lapsing of their option to terminate without liability to Black, then, that alleged reliance was simply unreasonable.

### (iii). Reliance Damages:

Third, the Court notes that damages from reliance "requires proof of 'irremedial change in position.'" *Haeberle*, 624 F.2d at 1140 (*quoting Philo Smith & Co. Inc. v. USLIFE Corp*, 554 F.2d 34, 36 (2d Cir.1977)). As stated above, Bresee's could have exercised the termination clause as to all participants at any time prior to the vesting of that participant's benefits. It is clear that Bresee's sought to terminate the plan at the eleventh hour (and only after Black had performed and sought to enjoy the benefits that had vested in him). (*See* § I, ¶ 3). There is no evidence that Bresee's ever considered terminating prior to Black's vesting, but stayed their hand in reliance on DiCresce's representations. Rather, the Court finds it far more likely that Bresee's simply failed to appreciate the liabilities represented by the Plan, and then belatedly undertook drastic (and ultimately unlawful) action only because Black's application brought home to them the financial consequences of the plan—not because they believed that the clause allowed them to delay such action until that point.

In short, the Court finds no credible evidence in the record that Bresee's altered any course of action it undertook, or failed to undertake, in reliance on the termination clause or any other statements by DiCresce.

### III. CONCLUSION

By way of summary then, plaintiff Black has prevailed on his claims against defendants Bresee's Oneonta Department Store, Inc. Security Plan and Bresee's Oneonta Department Store, Inc., for damages, prejudgment interest and costs in the amount of $27,022.26 and attorney's fees in the amount

of $8,737.50, and future payments as detailed in § II, ¶ B(1)(b) & (c) *supra*.

Third-party plaintiffs Bresee's Oneonta Department Store, Inc. Security Plan and Bresee's Oneonta Department Store, Inc. have failed to establish that third-party defendant Gary P. DiCresce d/b/a Gary P. DiCresce & Associates, is a fiduciary of the Plan, or is otherwise liable to Bresee's for the damages they owe Black. Therefore, third-party plaintiffs' claims are denied and dismissed.

**IT IS SO ORDERED**